**CONTEMPORARY MISSION, INC.,**
**Plaintiff-Appellant,**

v.

**UNITED STATES POSTAL SERVICE, Angelo J. Gaetano, Richard P. Evans, John Does I, II, and III, Defendants-Appellees.**

**Nos. 881, 882, Dockets 80–6134, 80–6202.**

United States Court of Appeals, Second Circuit.

Argued March 27, 1981.

Decided May 4, 1981.

---

William D. O'Reilly, Atkinson, N. H. (Leonard H. Rubin, Anderson & Rubin, New York City, of counsel), for plaintiff-appellant.

Richard N. Papper, Asst. U. S. Atty., S. D. N. Y., New York City (John S. Martin, Jr., U. S. Atty., S. D. N. Y., Michael H. Dolinger, Asst. U. S. Atty., S. D. N. Y., New York City, of counsel), for defendants-appellees.

Before OAKES and MESKILL, Circuit Judges, and SAND, District Judge.*

* Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

MESKILL, Circuit Judge:

This is a consolidated appeal from an order and judgment of the United States District Court for the Southern District of New York, Pierce, J., granting the defendants summary judgment and an order denying the plaintiff's post-judgment motion under Fed.R.Civ.P. 60(b). Plaintiff instituted this action against the United States Postal Service and several postal officials claiming, among other things, that the individual defendants and others had conspired to interfere with the plaintiff's rights under the First and Fifth Amendments. Plaintiff sought both monetary damages and an injunction to restrain the defendants from performing any further unlawful acts. For the reasons set forth below, we affirm. Because this appeal concerns the propriety of granting a summary judgment, we set forth the facts in some detail.

## BACKGROUND

Contemporary Mission purports to be a not-for-profit corporation engaged in religious and charitable pursuits, and maintains its principal place of business in the State of Connecticut. Appellant consists of a small group of Roman Catholic and Eastern-rite priests who support their organization, "virtually in full," with the revenue generated from a mail-order business. A. 40. Contemporary Mission's line of products has included a weight-reducing bath treatment called "Young & Firm"; golf lessons guaranteed to improve one's golf game by five strokes in five rounds; and tax-saving tips guaranteed to save taxpayers a minimum of $500. Appellant used pseudonyms in connection with its various enterprises; thus, for example, when selling tax tips it employed the name "CM, Inc. Tax Research Center," and when peddling golf lessons, appellant used the name "Golf Research Institute."

In April 1970 the Internal Revenue Service (IRS) granted Contemporary Mission an exemption from federal income tax pursuant to § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3) (1976). In a letter dated April 23, 1970 the IRS stated the basis of its decision to grant the exemption:

Inasmuch as you are an integral part of the operations of the Missionary Society of the Holy Apostles, which is listed in the Official Catholic Directory, you come within the scope of the above-mentioned ruling. Your exempt status will continue as long as the Society's name appears in the Directory submitted annually to our National Office.

A. 177. The reference to the Missionary Society of the Holy Apostles (Holy Apostles) in the IRS' letter came as a result of a correspondence dated April 10, 1970 in which Father Issac N. Raney of the Holy Apostles had represented that Contemporary Mission was affiliated with his apostolate. A. 243, 366. No formal association between the two organizations, however, ever materialized. A. 314.[1]

In 1975 Contemporary Mission applied as a nonprofit organization to the Postal Service for a "Special Bulk Third-Class Rates" permit which would allow appellant to send mail for 3.1 cents per item, rather than 8.3 cents per item, the normal bulk third-class mail rate. Contemporary Mission submitted the April 23, 1970 letter from the IRS and its Missouri "General Not For Profit Corporation" charter as proof of its nonprofit status. Shortly thereafter a special bulk rate permit was issued to appellant. The events which followed in the ensuing years formed the basis of this suit against the Postal Service and the individual defendants, in which Contemporary Mission alleged that the defendants and certain unnamed persons conspired to deprive plaintiff of due process of law and to revoke its postal permit because of its members' religious beliefs.

### Defendant Evans' Actions

In 1976, after receiving a series of consumer complaints, the Postal Service com-

---

1. Contemporary Mission's tax exemption was revoked by the IRS on September 11, 1979. That decision is being challenged in the Court of Claims. *Contemporary Mission v. United States*, No. 557–79T (Ct.Cl. filed Dec. 10, 1979).

menced an investigation [2] of Contemporary Mission's mail order business. Richard P. Evans, a Postal Inspector and one of the named defendants, began the inquiry into appellant's activities in September 1976. Most of the complaints received by the Postal Service concerned appellant's failure to deliver ordered merchandise or to fulfill "guarantees" that had been made in promotional literature.

Contemporary Mission claims that Evans conducted a campaign of harassment against it by turning over consumer complaints to the Connecticut Economic Crime Unit, the Westport Police, and the United States Attorney for the District of Connecticut; extracting a substantially false affidavit, dated January 19, 1977, from Father Leo Ovian, the Assistant Supervisor of the Holy Apostles, in which Father Ovian denied that any affiliation between appellant and his apostolate had ever existed and stated that Contemporary Mission had "manipulated" the Holy Apostles into preparing the April 10, 1970 letter to the IRS; [3] making derogatory comments to a local newspaper about Contemporary Mission; turning over a copy of Father Ovian's affidavit to the IRS in 1977; and finally, contacting a couple of commercial mail firms with whom appellant contracted and inquiring of them whether the priests of appellant wore clerical collars in the course of their business transactions.

Evans attested that he never turned over any of the complaints received by the Postal Service to the Connecticut Economic Crime Unit, but did receive complaints from the Westport Police. Evans further attested that he did conduct discussions with the United States Attorney's office throughout his investigation. With respect to the alleged "extraction" of Father Ovian's affidavit, Evans attested that he interviewed Father Ovian in the presence of Father Raney on January 14, 1977 about the latter's relationship with Contemporary Mission and that Father Ovian "freely and without any promise or threats of any kind" agreed to summarize the interview in a sworn affidavit. Additionally, Evans denied that he ever gave any information to the author of the 1977 newspaper article concerning the appellant. In connection with the IRS, Evans concedes that he contacted the IRS in late 1976 and 1977 about appellant's tax exemption, but states that he did so because the tax exemption had been the basis for granting appellant its nonprofit permit. However, Evans "[did] not recall giving a copy of Father Ovian's affidavit to anyone at IRS." A. 101. Additionally, Evans attested that in early 1979 he contacted two of appellant's contract mailers to determine the volume of mail being sent by them on behalf of appellant, and that he may have questioned whether the members of appellant wore clerical garb, since they had when they applied for the nonprofit permit in 1975. Finally, Evans concluded in his affidavit that he acted in good faith, knew nothing of appellant's religious beliefs, and at all times acted within the scope of his authority.[4]

2. In August 1976 the Consumer Protection Office of the Law Department of the United States Postal Service filed a complaint against Contemporary Mission under 39 U.S.C. § 3005 (1976) in which it alleged that Contemporary Mission had made false representations about its "Young & Firm" product. After a full hearing, the ALJ "concluded as a matter of law that [Contemporary Mission had] engaged ... in a scheme for obtaining money or property through the mails by means of false representations, within the meaning of Section 3005, Title 39, United States Code." A. 161–62. In January 1977 Contemporary Mission entered into a consent decree in which it agreed to discontinue its fraudulent activities.

3. According to the defendants, Father Ovian's retraction on behalf of the Holy Apostles later served as the basis for the revocation of Contemporary Mission's postal permit. The substance of Father Ovian's affidavit is corroborated by two other affidavits of Father Raney filed in two federal courts in 1972 and 1979, and a sworn statement by Father Raney given to Inspector Evans dated March 30, 1978. A. 182–83, 313–14.

4. C. Neil Benson, the Chief Postal Inspector of the Inspection Service Department of the United States Postal Service, submitted an affidavit in which he attested that the decision to investigate Contemporary Mission and all of Evans' actions were "reasonable and warranted," and

## Defendant Gaetano's Actions

Plaintiff also alleges that defendant Angelo J. Gaetano, a Mail Classification Clerk, twice interrupted the plaintiff's mailings without authorization. In 1976 the Postal Service received complaints about appellant's use of nonprofit postal rates for what appeared to be commercial activities. A meeting was held in which members of Contemporary Mission, Gaetano, and two other postal officials discussed the problem. In the course of the discussion, appellant contended that it had received previous clearance to use several of the pseudonyms. After the meeting, a letter was prepared by Gaetano outlining the irregularities involving appellant's mailings that still concerned the Postal Service. The letter was sent to appellant on March 16, 1976.

On March 22, 1976 Gaetano instructed a postal clerk to "hold" appellant's bulk mailings which suddenly had dramatically increased. Gaetano attested that his action, which he characterized as routine, resulted from his uncertainty concerning the validity of appellant's permit. The following day a meeting took place among appellant, appellant's lawyer, and postal officials at which Contemporary Mission "pointed out . . . that Gaetano had arbitrarily interfered with our mail and . . . threatened to sue Gaetano for damages if he continued to do such things." A. 38. Thereafter, the Postal Service agreed to accept appellant's mailings. Appellant concedes that it was caused no harm by the brief interruption.[5]

Three years later, on May 7, 1979, one of Gaetano's superiors handed him a memorandum from the Postal Inspection Service, which incorporated the final report of Inspector Evans. The report noted that, in 1970, "the major determining factor in granting the non-profit mailing rate" to Contemporary Mission had been the passage in the April 23, 1970 IRS letter which stated that appellant was "an integral part of the operations of the Missionary Society of The Holy Apostles" and thus entitled to share in the Holy Apostles' tax exemption. Annexed to the report were sworn statements of Father Ovian and Father Raney of the Holy Apostles which contradicted the aforementioned IRS letter with statements to the effect that Contemporary Mission had never been affiliated with the Holy Apostles. The Postal Inspector concluded in the report that Contemporary Mission must have known of Father Raney's position that no association between the two organizations existed at the time Contemporary Mission applied for the special per-

---

based upon information "showing that [Contemporary Mission] might have obtained its authorization to mail at the special rates on the basis of false or erroneous information." A. 284.

5. Appellant's continued use of pseudonyms in its mailings, however, prompted another postal official, Darwin Sharp, to write to appellant in September 1976. The letter advised:

It has come to our attention, through many letters of complaint from postal customers, that you are using the nonprofit bulk third-class permit authorized for the use of Contemporary Mission to advertise for mail order sale, a book, costume jewelry, a golf improvement scheme, and a so-called reducing bath product. These advertisements did not show that they were mailed by Contemporary Mission or that the mailer was connected with the Montfort Mission. They showed only "CM" on the envelopes and letterheads. This caused confusion and resentment. It appeared that a commercial enterprise was mailing at the special nonprofit third-class rates.

In any future mailings, it should be made clear, on your letterhead and the return address on your envelopes, that the mailing is made by a religious organization, Contemporary Mission, so that the Postal Service will not be required to write letters of explanation on your behalf. The name shown on the mailings should be the name for which the special rate permit was authorized.

A. 63. Contemporary Mission responded with a request by letter that the Postal Service "forward all of these letters to us" and also furnish a copy of the pertinent regulation. A. 64. The Postal Service then advised appellant that since the complaint letters were addressed to the Postal Service, the Postal Service should answer them and that no specific regulation required a sender to identify itself but that this requirement was "clearly implied and reflected throughout our general regulations." A. 65. Shortly thereafter a specific regulation requiring nonprofit permit holders to identify themselves on letterheads and envelopes was adopted. See Domestic Mail Manual § 134.58, A. 307.

mit in 1975, because one of the attached sworn statements had been filed in an action in federal court in 1972 in which Contemporary Mission was a party. A. 206.

After studying the report, Gaetano attested that he was instructed by his supervisor, Seymour Feldschneider, to send to Contemporary Mission a notice of pending revocation of its special bulk third-class mail authorization, pursuant to the pertinent provisions of the Domestic Mail Manual.[6] The notice, which was mailed on May 8, 1979, advised appellant of the grounds for the pending revocation and notified that it had fifteen days in which to file a written appeal.

In a letter dated May 21, 1979 and received May 23, 1979, Contemporary Mission objected to the Postal Service determination, citing Father Raney's April 1, 1970 letter as proof of its affiliation with the Holy Apostles, and requested that it be afforded a full hearing. On May 23, 1975, after reviewing appellant's letter, Gaetano sent a notice of final revocation of its permit to Contemporary Mission. The revocation notice reiterated the reasons previously set forth in the preliminary notice as the basis for the decision.

Two days later, on May 25, 1979, a postal official in Washington, D. C. informed Gaetano that the appeal filed by Contemporary Mission should have been forwarded to the Office of Mail Classification in Washington, D. C. for a final determination. Gaetano was instructed to rescind the revocation, and he did so immediately. It is undisputed that no mailings of Contemporary Mission were affected by the May 23 revocation. A. 281. Gaetano concludes in his affidavit that he acted in good faith, that he thought he was authorized to send the final notice of revocation, and that he knew nothing of Contemporary Mission's members' religious beliefs.

*The Proceeding Below*

Notwithstanding that an administrative appeal already had been filed with the Postal Service, Contemporary Mission filed this action on June 8, 1979 in the United States District Court for the Southern District of New York. The complaint alleged that the Postal Service, Gaetano, Evans, Father Ovian and "other members of the Missionaries of the Holy Apostles," conspired to interfere with appellant's rights under the First and Fifth Amendments.[7] The complaint sought exemplary damages in excess of $1 million and injunctive relief. After the defendants answered, appellant moved for a preliminary injunction. Shortly thereafter Contemporary Mission served several deposition notices and subpoenas on the defendants. The defendants then moved to stay all discovery on the ground that they planned to move that the action be dismissed, or in the alternative, that summary judgment be granted to the defendant. Judge Pierce stayed all discovery pending the determination of the government's motion.

On June 26, 1980 Judge Pierce granted the defendants' motion for summary judgment, dismissing all of the plaintiff's claims

---

**6.** *See* Domestic Mail Manual § 643.1 (formerly § 134.561).

**7.** The complaint also purported to set forth causes of action under 39 U.S.C. §§ 101(a), 403(c) (1976) and 18 U.S.C. §§ 1701–1703 (1976). The plaintiff asserted as its jurisdictional bases 28 U.S.C. §§ 1331, 1332 and 1339 (1976), 39 U.S.C. § 409 (1976), and the pendent jurisdiction of the court. The reference to pendent jurisdiction apparently was made to cover an unclear common-law claim asserted in the complaint.

Judge Pierce correctly rejected the three criminal statutes, 18 U.S.C. §§ 1701–1703, as bases for jurisdiction. Likewise Judge Pierce properly determined that § 101(a) of Title 39 did not provide a private cause of action against either the Postal Service or the defendants. Finally, Judge Pierce correctly ruled that § 403(c) could not be construed as creating a private cause of action against the individual defendants and that, with respect to the Postal Service, plaintiff's failure to exhaust its administrative remedies required dismissal of those causes of action brought against the Postal Service. *See* 28 U.S.C. § 2675(a) (1976). Judge Pierce determined that it lacked jurisdiction over the plaintiff's pendent claims, "there being no apparent advantages of judicial economy and convenience, or unfairness to the litigants." A. 382 (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

asserted under federal statutes and the Constitution. The district court concluded that the Postal Service was immune from suit under either the First or Fifth Amendments, *see Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 410, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971) (Harlan, J. concurring), and that the remainder of the plaintiff's claims against the Postal Service required dismissal because of plaintiff's failure to exhaust its administrative remedies. *See* 28 U.S.C. § 2675(a) (1976). In rejecting plaintiff's constitutional claims against the individual defendants, Judge Pierce ruled that none of the acts of Evans reached "the level of a tort under the Fifth Amendment." A. 380–81. Moreover, Judge Pierce noted that the plaintiff conceded that not one of its mailings was affected by Gaetano's actions. In dismissing the plaintiff's claim under the First Amendment, Judge Pierce stated:

> Assuming arguendo that the factual allegations of the plaintiff are true, CMI has nonetheless failed to demonstrate that any of the acts alleged interfered with CMI's constitutional rights under the establishment of religion and free exercise clauses of the first amendment. It appears that the defendants' alleged acts only affected plaintiff's *commercial* activities. Indeed, nowhere in the complaint or in its submissions regarding the present motions does plaintiff allege that it was engaged in any religious activity which was interfered with by the defendants.

A. 378 (emphasis in original).

Judge Pierce also rejected the plaintiff's contention that, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, it should have been allowed to conduct discovery prior to the determination of the defendants' motion for summary judgment. Judge Pierce determined that, contrary to the contention of the plaintiff, none of the factual issues raised in its submission constituted a genuine issue of material fact.

On July 14, 1980 plaintiff filed its notice of appeal. Thereafter, plaintiff claims that it learned that the Postal Service had decided on June 26, 1980 finally to revoke its permit. On August 15, 1980 plaintiff made a post-judgment motion under Fed.R.Civ.P. 60(b) coupled with another preliminary injunction motion. Judge Pierce denied the motion on October 7, 1980 on the ground that the notice of appeal filed by the plaintiff on July 14, 1980 divested the district court of jurisdiction over the action. *See Weiss v. Hunna,* 312 F.2d 711, 713 (2d Cir.), *cert. denied,* 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073 (1963). Nevertheless, Judge Pierce noted that he would have denied the motion in any event.[8] Plaintiff filed a notice of appeal from that decision on October 17, 1980, and thereafter that appeal was consolidated with plaintiff's appeal from Judge Pierce's June 30, 1980 decision.

## DISCUSSION

Contemporary Mission's principal contention on appeal is that Judge Pierce erred in denying the plaintiff an opportunity to conduct discovery prior to ruling on the defendant's motion to dismiss or for summary judgment.[9] Specifically, the

---

8. Judge Pierce stated:

> A preliminary review of the 60(b) motion discloses insufficient justification for vacating the earlier judgment. The charges of government conspiracy in delaying the revocation of reduced rate mail privileges are *not* supported by the evidence presented thus far. (See affidavits of William D. O'Reilly and Father John T. O'Reilly accompanying plaintiff's 60(b) motion.) The alleged due process violations by Postal Service authorities set forth in the 60(b) motion and detailed in the accompanying affidavits present issues not raised in the original complaint, to wit, the

validity of the revocation process and the procedures involved in the *permanent* revocation of CMI's mail privileges.

> Thus, were the Court of Appeals to grant leave for this court to consider the 60(b) motion, that motion would be denied.

A. 536 (emphasis in original).

9. The material in the text of this opinion is addressed exclusively to the claims asserted against the individual defendants. All of the claims asserted by the plaintiff against the Postal Service were properly dismissed. The damage claims against the Postal Service are governed by the Federal Tort Claims Act, *see*

plaintiff claims that, pursuant to Fed.R. Civ.P. 56(f), Judge Pierce should have rejected the defendants' application pending the completion of sufficient discovery to enable the plaintiff to respond adequately to the affidavits submitted by the defendants in support of their motion. Rule 56(f) provides:

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Plaintiff contends that had Judge Pierce permitted it to conduct discovery, it would have been able to demonstrate that "someone in the Postal Service, motivated as we have alleged in the complaint, decided to put into motion a harassing investigation of the Mission, with the results alleged in the [c]omplaint." A. 346.[10] We believe that the district court acted well within its discretion in preventing the plaintiff from burdening the defendants with a needless round of discovery in this frivolous lawsuit.

In connection with the plaintiff's First Amendment claim, the affidavits of the individual defendants submitted in support of the defendants' motion soundly negate the unsupported allegation of the plaintiff that the actions between 1976 and 1979 of Gaetano and Evans were motivated by a desire to harass the members of Contemporary Mission because of their religious beliefs. The plaintiff did not come forward with a scintilla of evidence that would tend to prove its allegation that defendant Gaetano's actions were prompted by a desire to interfere with plaintiff's members' freedom of religion. Moreover, with respect to defendant Evans, plaintiff offered in its affidavit prepared by Father John O'Reilly only two insubstantial items: first, an offering of hearsay[11] to the effect that an Assistant United States Attorney mentioned to him on one occasion that Evans had once referred to plaintiff's members as "crazy priests" who might have been fraudulently ordained, and, second, that Evans on one occasion may have asked one of plaintiff's contract mailers whether the members of plaintiff with whom they dealt wore clerical collars. The overwhelming evidence submitted by the defendants in their affidavits, however, amply refutes the allegation concerning religious harassment.[12]

39 U.S.C. § 409(c) (1976). *See Myers & Myers, Inc. v. United States Postal Service*, 527 F.2d 1252, 1255 (2d Cir. 1975); *Grasso v. United States Postal Service*, 438 F.Supp. 1231, 1236 (D.Conn.1977). The district court correctly ruled that appellant's failure to present its claim to the Postal Service and receive a final administrative determination prior to asserting the claim in the district court mandated dismissal. 28 U.S.C. § 2675(a) (1976). *See Grasso v. United States Postal Service, supra*, 438 F.Supp. at 1237. Moreover, the district court correctly determined that it lacked subject matter jurisdiction over the claims against the United States Postal Service that were based upon certain postal officials' alleged interference with plaintiff's constitutional rights. The waiver of sovereign immunity contained in 28 U.S.C. § 1346(b) (1976) is limited to suits predicated upon a tort cause of action cognizable under state law. *See Birnbaum v. United States*, 588 F.2d 319, 322 (2d Cir. 1978). Finally, to the extent that plaintiff's complaint can be construed as alleging that the Postal Service tortiously interfered with plaintiff's contract rights, the claim is specifically barred by 28 U.S.C. § 2680(h) (1976).

10. According to the complaint, the defendants were motivated by one or both of the following:

A. A desire to harass and interfere with the Mission, because they are a group of non-traditional priests, following a non-traditional apostolate.

B. A desire to harass and interfere with the Mission because of a belief that it should not, despite its religious motivation, engage in selling books and other materials in possible competition with other users of the mails. A. 10.

11. This hearsay evidence properly could have been disregarded, since Rule 56(e) requires that an affidavit be made on personal knowledge of the affiant and set forth facts that would be admissible in evidence.

12. Appellant's additional argument that the actions of the defendants, though directed at its commercial activities, had an incidental effect upon their religious beliefs is simply specious.

The defendants attested that the investigation of appellant was commenced after a series of consumer complaints were received by the Postal Service concerning problems with plaintiff's various products. Other complaints were received which questioned the propriety of a nonprofit permit being used by an apparently commercial organization. Indeed, it is undisputed that in August 1976 the Postal Service filed a complaint against Contemporary Mission in connection with its "Young & Firm" weight-reducing product, which resulted in the entry of a consent decree in which the appellant agreed to remove the product from the market and repay all money to the defrauded purchasers. In another context, the plaintiff does not dispute that it offered the IRS letter dated April 23, 1970 granting appellant a tax exemption based on its affiliation with the Holy Apostles as proof of its eligibility for a special nonprofit bulk third-class permit. Thus, it seems clear that when the Postal Service decided to revoke appellant's permit in May 1979, it based its decision upon the sworn statements of the two high officials of the Holy Apostles who had categorically denied that appellant had ever been affiliated with their apostolate, rather than upon some religious bias possessed by some postal officials toward the plaintiff.

█ In connection with its Fifth Amendment claim, the plaintiff concedes that the "Mission suffered no direct special damages based upon the bad conduct of Evans, Gaetano, and the John Does," but asserted that "the fact remains that their activities have resulted in a denial of due process to the Mission." A. 346. We agree with Judge Pierce's conclusion concerning defendant Evans that even assuming that all of the acts alleged occurred, appellant "failed to demonstrate that such acts . . . constitute[d] a violation of its right of due process. Without more, such a claim is merely specious." A. 380. Likewise, Judge Pierce's rejection of plaintiff's Fifth

Amendment claim against defendant Gaetano was proper. The acts of defendant Gaetano which had, at most, the effect of suspending plaintiff's permit privileges for one day in 1976 and two days in 1979 hardly rose "to the level of a constitutional tort under the fifth amendment." A. 381.

By its own affidavit the plaintiff has demonstrated its inclination to forego available administrative procedures and instead to resort to the · courts. In March 1976, after defendant Gaetano had "held" the plaintiff's mail for one day because of his belief that appellant's use of the. nonprofit rate might be unauthorized, Father O'Reilly and his present attorney "threatened to sue Gaetano for damages if he continued to do such things." A. 38. Although defendant Gaetano did not do any "such things" for the next three years, appellant in May 1979 decided to institute this action against the Postal Service and the individual defendants after receiving the notice of the pending revocation of its permit, but prior to exhausting the available administrative remedies.

█ Stripped of its constitutional rhetoric, the complaint in this action alleges nothing more than that the Postal Service conducted an investigation to reevaluate appellant's entitlement to its nonprofit permit, held up its mail for one day in 1976, and concluded in May 1979 that the permit should be revoked. In an obvious effort to evade the strictures of administrative review and to intimidate postal officials, the plaintiff colored its complaint with conclusory allegations of a wide-ranging conspiracy to deprive it of its constitutional right to due process and free exercise of religion. But when summoned to the task of furnishing affidavits to demonstrate the existence of a genuine issue of material fact, the plaintiff feebly responded by noting immaterial inconsistencies in the defendants' affidavits [13] and by making a desperate plea to allow discovery to substantiate its con-

---

**13.** For example, in plaintiff's Rule 9(g) statement in which it is obligated under the Rules of the Southern District of New York to set forth what it considers material factual issues, plaintiff contended that prior to September 1976 defendant Evans was employed in a New York office rather than in a Connecticut office, as the defendants had stated.

clusory allegations. However, "[t]his court has repeatedly held that complaints containing only 'conclusory,' 'vague,' or 'general allegations,' of conspiracy to deprive a person of constitutional rights" cannot withstand a motion to dismiss. *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977); *see Black v. United States*, 534 F.2d 524, 527–28 (2d Cir. 1976); *Powell v. Jarvis*, 460 F.2d 551, 553 (2d Cir. 1972). And it is clear that a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover.[14] *See* 10 C. Wright & A. Miller, Federal Practice and Procedure § 2739 at 715–16 (1973). "An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of the motion." *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir. 1978).

 Where a plaintiff fails to produce any specific facts whatsoever to support a conspiracy allegation, a district court may, in its discretion, refuse to permit discovery and grant summary judgment. Something more than a fanciful allegation is required to justify denying a motion for summary judgment when the moving party has met its burden of demonstrating the absence of any genuine issue of material fact. A "bare assertion" that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f). *See United States v. Donlon*, 355 F.Supp. 220, 225 (D.Del.), *aff'd*, 487 F.2d 1395 (3d Cir. 1973). Rule 56(f) cannot be relied upon to defeat a summary judgment motion "where the result of a continuance to obtain further information would be wholly speculative." 6

J. Moore, Federal Practice ¶ 56.24 at 56–1438. *See First National Bank v. Cities Service Co.*, 391 U.S. 253, 293–94, 88 S.Ct. 1575, 1594, 20 L.Ed.2d 569 (1968).

Courts must be particularly cautious to protect public officials from protracted litigation involving specious claims. In *Butz v. Economou*, 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978), the Supreme Court specifically noted the availability of pretrial motions to dispose of spurious claims. The Court stated

> that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity.... In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits.

*Id.* (footnote omitted). In the case at bar, the defendants produced affidavits setting forth reasonable grounds for their actions and, in addition, attested that they acted in good faith. The plaintiff responded by presenting immaterial factual inconsistencies and by reiterating its conclusory allegations of conspiracy. We are satisfied that the defendants sustained their burden of demonstrating that no genuine issue of material fact existed in this action that would warrant a trial.[15]

 Finally, the district court properly denied plaintiff's post-judgment motion under Fed.R.Civ.P. 60(b). The filing of the notice of appeal divested the district court of jurisdiction to entertain the motion. *Weiss v. Hunna*, 312 F.2d 711, 713 (2d Cir.), *cert. denied*, 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073 (1963). In any event, we

---

**14.** An "opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." 6 J. Moore, Federal Practice ¶ 56.15[3] at 56–486 to 56–487 (2d ed. 1976) (footnotes omitted).

**15.** While the government would like us to adopt a sweeping rule for the summary disposition of cases such as this, we must abide by the Supreme Court's admonition in *First National Bank v. Cities Service Co., supra*, 391 U.S. at 259, 88 S.Ct. at 1577–1578, that "the question whether summary judgment is appropriate in any case is one to be decided upon the particular facts of that case."

would agree with the district court that the motion should be denied. The due process challenge to the administrative review procedures themselves was raised for the first time in the Rule 60(b) motion and should be rejected.

Affirmed.