**OPALS ON ICE LINGERIE, Designs by Bernadette, Inc., Plaintiff–Counter–Defendant–Appellant,**

v.

**BODY LINES INC., d/b/a Curves, Defendant–Counter–Claimant–Appellee.**

**Docket No. 02–7392.**

United States Court of Appeals, Second Circuit.

Argued Oct. 23, 2002.

Decided Feb. 24, 2003.

David P. Lennon, White Plains, N.Y. (Lennon & Klein, White Plains, NY, of counsel), for Appellant.

Michael A. Haskel, Garden City, NY, for Appellee.

Before: MESKILL, NEWMAN and POOLER, Circuit Judges.

MESKILL, Circuit Judge.

Plaintiff-appellant Opals on Ice Lingerie, Designs by Bernadette, Inc. (Opals) appeals from an order of the United States District Court for the Eastern District of New York, Glasser, *J.*, granting summary judgment in favor of defendant-appellee Bodylines, Inc. (Bodylines) on *Opals'* action seeking declaratory judgment and an

order directing Bodylines to submit to arbitration. Diversity jurisdiction is proper pursuant to 28 U.S.C. § 1332 because the appellant is a New York corporation with its principal place of business in New York, and the appellee is a Nevada corporation with its principal place of business in California, and the amount in controversy is more than $75,000. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 as this is an appeal from a final judgment of the district court. *See Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).

## BACKGROUND

Opals is a New York corporation that designs, manufactures and sells women's lingerie. The president of Opals is, and was at all relevant times, Bernadette Di-Vito (DiVito). Bodylines is a Nevada corporation that was in the business of manufacturing and selling silicone breast enhancement inserts for women's undergarments. The president of Bodylines is, and was at all relevant times, Julie Sautter (Sautter).

In September 1997, representatives of Opals and Bodylines were introduced to each other by Irwin Karnick, the president of a catalog production firm that had done work for both companies. The parties discussed the possibility of entering into a joint venture making women's undergarments that would be specially designed to accommodate the silicone inserts already being marketed by Bodylines. Bodylines requested that Opals send it samples of Opals' products; Opals refused to send samples until the parties entered into a formal agreement.

In October 1997, Opals faxed a Non–Circumvention Agreement (the "10/97 Agreement") to Bodylines which specified, *inter alia*, that Opals would continue to own all of the intellectual property rights in its products. The 10/97 Agreement was signed by DiVito on behalf of Opals. The Agreement included the following provision: "Any dispute arising under or relating to this Agreement shall be submitted to binding arbitration in the State of New York pursuant to the rules for commercial arbitration of the American Arbitration Association."

On November 17, 1997, Bodylines faxed the 10/97 Agreement back to Opals, signed by Sautter on behalf of Bodylines. Opals contends that it received the 10/97 Agreement with Sautter's signature on it, and no additional writing or addenda. However, Bodylines contends that it added the following sentence under the signature line when Sautter signed the 10/97 Agreement: "This Agreement is subject to the attached addendum." This addendum (the "11/97 Addendum") made various changes to the 10/97 Agreement, including replacing the paragraph regarding arbitration in New York with a paragraph containing the following language:

> This Agreement shall be deemed to [illegible] California and any and all performance hereunder of [sic] breach thereof shall be interpreted and construed pursuant to the laws of the State of California without regard to conflict of laws and principles. If both parties fail to agree to arbitrate or mediate any disputes, the parties hereby consent to the jurisdiction of the courts of the State of California.

The 11/97 Addendum was signed by Sautter on behalf of Bodylines; it was not signed by Opals.

Later in November 1997, Irwin Karnick, who had first introduced the parties, requested that another Non–Circumvention Agreement (the "Karnick Agreement") be drafted which confirmed a "finder's fee"

for Karnick and provided for Bodylines to pay Opals $5,000 towards "development costs." The Karnick Agreement, which is undated, contained the language that had been included in the 10/97 Agreement regarding arbitration in New York. The Karnick Agreement was signed by DiVito on behalf of Opals. Opals contends that it faxed the Karnick Agreement to Bodylines, and that Bodylines faxed the Karnick Agreement back, signed by Sautter.

Bodylines contends that it never received the Karnick Agreement, and that neither Sautter nor any agent of Bodylines signed the Karnick Agreement. When Opals filed its complaint in district court, it attached a copy of the Karnick Agreement only, and the complaint relied on the Karnick Agreement entirely, not mentioning any other alleged agreements.

Sautter's signature appears on the copy of the Karnick Agreement that is in the record. Sautter's signature also appears on the copy of the Karnick Agreement that was attached to Opals' complaint. However, Bodylines claims that the signature was "cut and pasted" onto the Karnick Agreement from another document. Each party retained its own forensic expert to review the document, and both experts agreed that the Sautter signature on the Karnick Agreement attached to Opals' complaint was indeed "cut and pasted."[1] The parties now do not dispute that the Karnick Agreement does not bear an original signature by Sautter or by anyone else on behalf of Bodylines. There is no evidence in the record that would indicate who cut and pasted Sautter's signature onto the Karnick Agreement, or when it was done.

In or about December 1997, Sautter and DiVito had a meeting at which Opals showed Bodylines certain samples of its products. It is unclear whether these samples actually were given to Bodylines at that time, or whether Sautter simply viewed them at the meeting. Additional samples were sent to Bodylines at some time in 1998.

On December 10, 1997, Bodylines faxed to Opals a document entitled "Addendum to Non–Circumvention Agreement" (the "12/97 Addendum") which was signed by Sautter on behalf of Bodylines. The 12/97 Addendum contains the following language:

> This Agreement shall be deemed to have been made in Belmont, California and any and all performance hereunder of [sic] breach thereof shall be interpreted and construed pursuant to the laws of the State of California without regard to conflict of laws and principles. Any disputes arising out of this Agreement shall be subject to arbitration by the American Arbitration Association in the State of California in the Northern District. Nothing shall preclude either party from seeking injunctive relief from a court.

At the same time, Bodylines also faxed a Confidentiality Agreement to Opals. Opals did not sign either the 12/97 Addendum or the Confidentiality Agreement.

Bodylines and Opals never consummated a working relationship. Opals contends that Bodylines appropriated Opals' lingerie designs and manufactured its own infringing products, based on the samples it received from Opals. On May 18, 1999, Opals commenced an arbitration proceeding in New York alleging infringement of Opals' designs and unfair trade practices. In June 1999, counsel for Bodylines asserted that there was no valid agreement to arbitrate. In response to that assertion by Bodylines, Opals commenced the instant

---

1. It appears that Bodylines' expert rendered his opinion that the signature was not authentic on October 27, 2000, and Opals' expert concurred on January 31, 2001.

litigation in the Eastern District of New York.

The complaint, filed with the district court on July 2, 1999, has one attachment: the Karnick Agreement. The complaint states that Opals seeks a declaration "that the non-circumvention Agreement is binding and enforceable as against the parties," a declaration "that all claims between the parties hereto relating to the Agreement must be arbitrated in the State of New York," and an injunction barring Bodylines "from taking any steps to interfere with the administration of the American Abritration Association relating to the parties' dispute." There is no question that the "Agreement" referred to in the complaint is the Karnick Agreement.

While this litigation was pending before the district court, both Bodylines and Opals participated in proceedings before the arbitration panel in New York, including conferences and discovery. However, Bodylines argued throughout the process that the arbitration clause was not valid, that the arbitration panel did not have jurisdiction over the dispute, and that Bodylines was not required to participate in arbitration. On February 1, 2000, seven days before the arbitration hearing was scheduled to begin, Bodylines filed suit in a California court seeking a temporary restraining order and preliminary injunction preventing the arbitration from going forward, as well as a declaration that the Karnick Agreement was void. The court in California denied Bodylines' motion for a TRO/preliminary injunction on February 7, 2000, and the arbitration hearing proceeded as scheduled on February 8, 9 and 10, 2000. The hearing was not completed in those three days, and was scheduled to continue at a later date.

At the outset of the arbitration hearing, the arbitrators made a provisional finding that the panel had jurisdiction to hear the matter, and ordered the hearing to proceed. The arbitrators indicated that they believed that the facts relating to jurisdiction—that is, to whether there was an enforceable contract to arbitrate—were inextricably connected with the proof required on other issues. Accordingly, the arbitrators determined that it made sense to proceed with the hearing and to rule definitively on the jurisdictional issue along with the other issues at the end of the proceedings.

On June 21, 2000, after the California case had been removed to federal court, the California case was transferred to the Eastern District of New York and consolidated with the declaratory judgment action that had been filed by Opals. On December 5, 2001, Bodylines moved for summary judgment on Opals' complaint, asserting that the Karnick Agreement "upon which OPALS bases Plaintiff's claims" was invalid. On January 11, 2002, Opals cross-moved for summary judgment and/or for an order compelling Bodylines to participate in arbitration.

The parties were scheduled to return to arbitration on March 11, 2002. However, on March 4, 2002, the district court entered an order granting Bodylines' motion for summary judgment, finding that there was no valid arbitration agreement, and dismissing Opals' complaint. This appeal followed.

## DISCUSSION

### I. *Standard of Review*

■■ "We review a district court's grant of summary judgment *de novo*, examining the evidence in the light most favorable to, and drawing all inferences in favor of, the non-movant. Summary judgment is appropriate only if it can be established that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to a judgment as a matter of law." *Int'l Bus. Machines Corp. v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 423 (2d Cir.2002) (internal citation and quotation marks omitted). The Supreme Court has held "that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Opals contends that we should review the district court's decision as though it were a ruling on a motion to compel arbitration, not a ruling on a motion for summary judgment. However, the record reveals that Bodylines filed a motion for summary judgment, and Opals filed "cross-motions for summary judgment and/or to compel Bodylines to arbitration." The district court's ruling granted Bodylines' motion for summary judgment and denied Opals' cross-motion for summary judgment. The district court did not reach Opals' motion to compel arbitration because once Bodylines' motion for summary judgment had been granted, the case was closed. Accordingly, the appropriate standard of review is that applied to rulings on motions for summary judgment.[2]

## II. *Waiver of Right to Object to Arbitration*

■ Opals contends, as a preliminary matter, that Bodylines waived its right to object to proceeding with arbitration because it submitted the issue of arbitrability to the arbitrators, and participated actively in the arbitration. "Although a party is bound by an arbitral award only where it

has agreed to arbitrate, an agreement may be implied from the party's conduct." *Gvozdenovic v. United Air Lines*, 933 F.2d 1100, 1105 (2d Cir.1991). In other words, if a party participates in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration, that party may be found to have waived its right to object to the arbitration. *See, e.g., ConnTech Dev. Co. v. Univ. Of Conn. Educ. Props.*, 102 F.3d 677, 685 (2d Cir.1996) (finding waiver where party had participated in 45 days of hearings and did not assert objection until 41 months after being served with notice of arbitration demand).

■ However, in this case, Bodylines objected repeatedly to arbitration, beginning with the statement by its counsel in June 1999 which inspired Opals to file the instant litigation. Correspondence between the parties throughout the period of the dispute further supports Bodylines' assertion that it continuously objected to arbitration. These objections prevent a finding of waiver. *See, e.g., Herman Miller, Inc. v. Worth Capital*, 1999 WL 132183, at *1 (2d Cir. Mar. 9, 1999) (summary order finding no waiver where party "repeatedly reserved the right to contest the existence of an agreement to arbitrate"); *AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir.2000) ("If a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the matter. If, however, a party clearly and explicitly reserves the right to object to arbitrability, his participation in the arbitration does not preclude him from challenging the arbitra-

---

**2.** A district court order granting or denying a motion to compel arbitration is also reviewed *de novo. See Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72 (2d Cir.1997).

Hence, even if we were to treat the district court's ruling as a ruling on a motion to compel arbitration, the scope of our review would be the same.

tor's authority in court.") (internal citation omitted).

Further, to the extent that Bodylines participated in the arbitration hearings in order to resolve the question of arbitrability itself, such participation does not constitute waiver. The Supreme Court has held that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue." *First Options of Chicago v. Kaplan,* 514 U.S. 938, 946, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). To the contrary, the Court noted in *First Options,* the fact that a party "forcefully object[s]" to having an arbitrator decide a dispute—as Bodylines clearly did—suggests an *unwillingness* to submit to arbitration. *Id. See also Textile Unlimited v. A..BMH & Co.,* 240 F.3d 781, 788 (9th Cir.2001) (holding that party did not waive right to object to arbitration by participating in arbitration proceedings where the party "only participated in the arbitration to contest the arbitration itself"); *Coady v. Ashcraft & Gerel,* 223 F.3d 1, 9 n. 10 (1st Cir.2000) (holding that party's objection to scope of arbitration was not waived by its participation in hearings because the party "consistently and vigorously maintained its objection to the scope of arbitration"). Thus, the district court was correct in finding that Bodylines had not waived its right to object to arbitration.

### III. *Absence of Genuine Issue of Material Fact*

Opals next contends that the district court erred in finding that no genuine issue of material fact existed as to whether Bodylines and Opals had entered into a valid and enforceable agreement to arbitrate as alleged in the complaint. Opals argues that the district court should have taken into account each of the various documents that were faxed back and forth between the parties throughout 1997. Ac-

cording to Opals, these documents, taken together, show a clear and unequivocal intent by the parties to arbitrate any disputes between them, and that applying the presumption in favor of arbitration that is so well established in federal law, the court should have ordered the parties to proceed to arbitration. We find this argument unpersuasive.

 The Supreme Court has stated that the Federal Arbitration Act (FAA) "is a congressional declaration of a liberal federal policy favoring arbitration agreements," and "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). But it is also true that "the FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties." *Mastrobuono v. Shearson Lehman Hutton,* 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). "Arbitration under the Act is a matter of consent, not coercion." *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). "[T]he purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, *but not more so.*" *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (emphasis added). Thus, though the presumption in favor of arbitration is strong, the law still requires that parties actually agree to arbitration before it will order them to arbitrate a dispute.

## A. *The Karnick Agreement*

The complaint in this case is based entirely on one document: the Karnick Agreement. The complaint does not allege that a series of documents, or some other agreement, gave rise to a valid and enforceable agreement to arbitrate. The complaint simply asks the court to declare the Karnick Agreement valid, and to order Bodylines to participate in arbitration as directed by the Karnick Agreement.

 Bodylines and Opals agree that the signature of Sautter on the Karnick Agreement was "cut and pasted"—in other words, that it is a forgery, not a genuine signature.[3] "Under [New York] State law and general contract law, a forged signature renders a contract void *ab initio*. Because there can be no meeting of the minds of the parties when a forgery has been perpetrated, no contract existed in the case at hand." *Orlosky v. Empire Sec. Sys.*, 230 A.D.2d 401, 403, 657 N.Y.S.2d 840, 842 (N.Y.App.Div.1997) (internal citations and footnote omitted).

 Because the Karnick Agreement is void and unenforceable, Opals is not entitled to the relief sought in its complaint: a declaration that the Karnick Agreement is valid, and an injunction forcing Bodylines to comply with its provisions. As the district court noted, Opals did not move to amend its complaint when

it discovered that the Karnick Agreement was a forgery, and if Opals' suggestion that the court consider the other purported agreements was intended to be construed as a motion to amend the complaint, such a motion would have been untimely. *See* Fed.R.Civ.P. 15(a). Accordingly, the district court was correct in granting summary judgment in favor of Bodylines and dismissing Opals' case.

## B. *Other Documents*

Opals argues that although the complaint does not refer to any documents other than the Karnick Agreement, the complaint should be construed as alleging that Opals and Bodylines had an agreement to arbitrate that was embodied in some *other* document, or combination of documents. Specifically, Opals contends that Bodylines agreed to arbitrate either because (1) Bodylines signed the 10/97 Agreement, which Opals also signed, without any addendum, or (2) Bodylines signed the 12/97 Addendum which includes an arbitration clause, and Opals signed the 10/97 Agreement which includes an arbitration clause, so both parties agreed to arbitrate. We do not find these theories persuasive.

First, we consider the 10/97 Agreement. Opals has produced a copy of this document which is signed by both DiVito and Sautter, and contains no addendum or

---

**3.** Opals contends that there is no evidence indicating who cut and pasted Sautter's signature on to the Karnick Agreement, and that it is possible that an agent of Bodylines placed the signature there, in which case Bodylines could be bound by the signature. This possibility, Opals argues, is sufficient to give rise to a genuine issue of material fact as to whether the Karnick Agreement is valid. However, it is well established that "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996). An "opposing

party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." *Contemporary Mission v. United States Postal Serv.*, 648 F.2d 97, 107 n. 14 (2d Cir.1981) (internal citations and quotation marks omitted). Opals' mere suspicion that someone at Bodylines placed Sautter's forged signature on the Karnick Agreement, instead of simply having Sautter sign it herself, is insufficient to create a genuine issue of material fact.

mention of any such addendum. Bodylines has produced a copy of this document, signed by both parties but with a note beneath Sautter's signature stating that the Agreement is subject to the 11/97 Addendum, which is attached. The forensic experts retained by the parties were unable to render a conclusive opinion as to whether either the Opals version or the Bodylines version of the 10/97 Agreement was legitimate. Neither side has produced an original of the document.

■ Opals contends that the disagreement between the parties as to which version of the 10/97 Agreement is authentic gives rise to a genuine issue of material fact. However, this argument fails to recognize that Opals' copy of the 10/97 Agreement is not admissible in evidence, and therefore cannot be considered in ruling on the motion for summary judgment.

> Rule 56(e) provides that affidavits in support of and against summary judgment "shall set forth such facts as would be *admissible in evidence.*" Fed. R.Civ.P. 56(e) (emphasis added); *see also Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir.1962) ("Since the object [of summary judgment] is to discover whether one side has no real support for its version of the facts, the Rule specifically states that affidavits shall 'set forth such facts as would be admissible in evidence.' ") (citation omitted). Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.

*Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997).

Rule 1003 of the Federal Rules of Evidence states: "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed. R.Evid. 1003. Opals has produced a photocopy only of the 10/97 Agreement and has conceded that it cannot produce either an original fax copy or a copy with an original signature. Bodylines contends that Opals "whited out" the note below Sautter's signature making the 10/97 Agreement subject to the 11/97 Addendum. Sautter stated in her affidavit that she made the note regarding the addendum at the time she signed the document, and that the version she faxed back to Opals contained a cover letter referring to (1) the addendum, (2) the note below her signature making the Agreement subject to the addendum, and (3) the 11/97 Addendum itself. Accordingly, Bodylines has raised a genuine question as to the authenticity of the original. Furthermore, because no original of the signed 10/97 Agreement can be located, because Bodylines has produced a copy of the 10/97 Agreement which is materially different from the copy produced by Opals, and because at least one other photocopied document produced by Opals in this case has been conceded to be a forgery, it would be unfair in these circumstances to admit Opals' copy. Accordingly, under either prong of Rule 1003, Opals' version of the 10/97 Agreement is not admissible.

■ Second, Opals argues that because Bodylines drafted and signed the 12/97 Addendum, which included a provision for arbitration in California, Bodylines manifested its consent to arbitration. According to Opals, it does not matter that there is no valid contract signed by both parties; Opals signed one contract calling for arbitration, and Bodylines signed another. Taken in conjunction, and in light of the strong presumption in favor of arbitration, Opals contends, these documents show that each party agreed to arbitration. This argument fails because it is clear

from the record that there was no meeting of the minds, and no contract was ever formed.

Under New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties. If there is no meeting of the minds on all essential terms, there is no contract. This is because an enforceable contract requires mutual assent to the essential terms and conditions thereof. *Schurr v. Austin Galleries of Ill.,* 719 F.2d 571, 576 (2d Cir.1983) (internal citations and quotation marks omitted). The documents drafted and signed by Opals each call for arbitration in New York, governed by New York law. The only documents undisputedly signed by Bodylines which contain an arbitration clause—the 11/97 Addendum and the 12/97 Addendum—each call for arbitration in California, governed by California law. This difference is significant and indicates that there was no meeting of the minds as to an agreement to arbitrate.

Opals cites a New York Appellate Division case, *Lory Fabrics v. Dress Rehearsal,* 78 A.D.2d 262, 434 N.Y.S.2d 359 (N.Y.App.Div.1980), for the proposition that a disagreement over where arbitration should take place is not sufficient to negate an otherwise clear showing that both parties agreed to arbitration. We do not find this case to be controlling. In *Lory Fabrics,* the parties agreed that they had a valid contract for the sale of goods; the only dispute was whether or not that contract included an agreement to arbitrate. *See id.* at 266, 434 N.Y.S.2d at 363. Here, by contrast, the parties do not agree that any valid contract was ever made. The differences between the 10/97 Agreement as signed by Opals and the 11/97 Addendum and 12/97 Addendum signed by Bodylines are dramatic; indeed, the proposed addenda drafted by Bodylines would change the whole character of the 10/97 Agreement. The 11/97 Addendum and the 12/97 Addendum each provides for circumstances under which Opals' designs would not be deemed confidential. Each also provides that Bodylines would not be precluded from marketing lingerie products other than those belonging to Opals. Likewise, the Confidentiality Agreement that was drafted by Bodylines and faxed to Opals at the same time as the 12/97 Addendum includes terms which DiVito apparently considered material to the parties' relationship; on her copy of the 12/97 Addendum DiVito wrote "I will *NOT SIGN!!*"

There is no genuine issue of material fact as to whether Opals and Bodylines reached a meeting of the minds as to the material terms of any agreement; the evidence in the record shows that they did not. Therefore, even if we were to accept Opals' invitation to consider agreements other than the Karnick Agreement, we conclude that no genuine issue of fact exists as to whether there was a valid contract between the parties, and Bodylines was entitled to summary judgment.

## CONCLUSION

We conclude that no genuine issue of material fact exists as to whether the Karnick Agreement, upon which the plaintiff-appellant based its claims in this case, contained a valid and enforceable agreement to arbitrate. Therefore, we affirm the district court's grant of summary judgment to the defendant-appellee, and its dismissal of the case.