Gregory F. DANIEL, M.D.,
et al., Plaintiffs,

v.

AMERICAN BOARD OF EMER-
GENCY MEDICINE, et al.,
Defendants.

No. 90–CV–1086A.

United States District Court,
W.D. New York.

Aug. 21, 2002.

Jaeckle, Fleischmann & Mugel, LLP (Ralph L. Halpern, Mary C. Fitzgerald, of Counsel), Buffalo, NY, Shearman & Sterling (George J. Wade, Kathleen M. Comfrey, of Counsel), New York City, for Plaintiffs.

Jackson & Campbell, P.C. (Philip L. O'Neill, of Counsel), Washington, D.C., Saperston & Day, P.C. (Thomas S. Gill, of Counsel), Buffalo, NY, for Defendants Riverside Methodist Hospitals and Our Lady of Mercy Medical Center.

Kelley Drye & Warren (Richard E. Donovan, of Counsel), New York City, for Defendant Our Lady of Mercy Medical Center.

Phillips, Lytle, Hitchcock, Blaine & Huber (Robert E. Glanville, of Counsel), Buffalo, NY, for Defendant ABEM and Liaison Counsel for Hospital Defendants.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on April 24, 1991. Summary judgment motions were filed by defendants Riverside Methodist Hospitals ("Riverside") on April 7, 1999 and Our

Lady of Mercy Medical Center ("OLM") on August 13, 1999. Plaintiffs filed cross-motions for discovery, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, on May 28, 1999 and July 27, 1999. On January 20, 2000, Magistrate Judge Foschio filed a Report and Recommendation, recommending that: (1) Riverside's motion for summary judgment be granted based on state action immunity; (2) alternatively, Riverside's motion for summary judgment on the grounds of an asserted education exemption to the Sherman Act and plaintiffs' agency theory of conspiracy be denied and; (3) OLM's motion for summary judgment be denied on all grounds. The Magistrate Judge also: (1) denied plaintiffs' cross-motion for discovery as to Riverside on the issue of state action immunity and dismissed as moot plaintiffs' request for discovery as to Riverside's claims of an education exemption and lack of involvement in the alleged conspiracy; and (2) dismissed as moot plaintiffs' motion for discovery as to OLM.

Both Riverside and plaintiffs filed objections on February 23, 2000. Oral argument on the objections was held on August 14, 2002.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, the Court: (1) grants Riverside's motion for summary judgment based on state action immunity; (2) denies OLM's motion for summary judgment on all grounds; and (3) affirms the Magistrate Judge's denial of plaintiffs' cross-motions for discovery. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court hereby determines that there is no just reason for delay and orders the Clerk of Court to enter final judgment in favor of defendant Riverside.

IT IS SO ORDERED.

## REPORT and RECOMMENDATION

### DECISION and ORDER [1]

FOSCHIO, United States Magistrate Judge.

#### JURISDICTION

This matter was referred to the undersigned on April 24, 1991 by the Hon. Richard J. Arcara for all pretrial matters. It is currently before the court on summary judgment motions by Defendants Riverside Methodist Hospitals filed April 7, 1999 (Docket Item No. 666) and Our Lady of Mercy Medical Center filed August 13, 1999 (Docket Item No. 695), and on Plaintiffs' cross-motions for discovery pursuant to Fed.R.Civ.P. 56(f) filed May 28, 1999 (Docket Item No. 683) and July 27, 1999 (Docket 722).

#### BACKGROUND

Plaintiffs, emergency medicine physicians, commenced this action on September 25, 1990, following refusal by the

---

1. This matter is before the court for a Report and Recommendation on summary judgment motions filed by Defendants Riverside Methodist Hospitals and Our Lady of Mercy Medical Center and for a Decision and Order on Plaintiffs' cross-motions for discovery pursu-

ant to Fed.R.Civ.P. 56(f). As the subject matter of Defendants' motions closely relates to the cross-motions, the court addresses the motions together to facilitate judicial consideration.

American Board of Emergency Medicine ("ABEM") to permit them to sit for the examination required for certification as an ABEM Diplomate in emergency medicine. In their Second Amended Complaint filed January 13, 1994, Plaintiffs asserted causes of action under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* ("the Sherman Act"), seeking relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 12 *et seq.* Except for Defendants ABEM and the Council of Emergency Residency Directors ("CORD"), Defendants are public and private teaching hospitals allegedly operating residency programs in emergency medicine.[2]

Plaintiffs served all Defendants with requests for discovery on the merits, including interrogatories and requests to produce, and requests for admissions on February 18, 1994. On February 24, 1994, Plaintiffs moved for class certification. On March 16, 1994, Defendants moved to stay class certification.

On April 20, 1994, Defendant Riverside Methodist Hospitals ("Riverside") moved to dismiss the Second Amended Complaint for lack of personal jurisdiction. Although other Defendants filed similar motions, Defendant Our Lady of Mercy Medical Center ("OLM") did not move at that time to dismiss for lack of jurisdiction. By order dated April 29, 1994, before any responses to Plaintiffs' discovery requests were served, the court stayed discovery on the merits pending the determination of jurisdictional motions. Discovery limited to the jurisdictional issues, which was allowed, then ensued.

In a Report and Recommendation filed January 16, 1996 (Docket Item No. 435), the undersigned recommended, among other things, that Riverside's motion to dismiss for lack of personal jurisdiction be denied. Certain other Defendants, including Ohio State University Hospital ("OSUH") and Lincoln Medical and Mental Health Center ("Lincoln"), which had similarly moved to dismiss for lack of subject matter jurisdiction, were also dismissed on the basis of 11th Amendment and state action immunity. Objections to the Report and Recommendation were filed by several parties including Riverside whose objections were filed on March 8, 1996. Defendants moved to continue the stay as to merit-based discovery pending Judge Arcara's decision on the objections to the Report and Recommendation. That request was granted by the undersigned on February 23, 1996.

Meanwhile, on December 14, 1994, Defendant Riverside moved to dismiss the Second Amended Complaint for failure to state a claim, and similar motions were filed by other Defendants. In a Report and Recommendation filed July 16, 1996 (Docket Item No. 537), the undersigned recommended those motions be denied. While objections to both Reports and Recommendations were pending, Plaintiffs moved on October 1, 1996, to vacate the stay of discovery as to class certification issues. By order dated November 20, 1996, that motion was denied.

On November 19, 1997, Judge Arcara rejected Defendants', including Riverside's, objections to the Reports and Recommendations filed January 16, 1996 and July 16, 1996.[3] Extensive settlement dis-

---

**2.** As the ten public hospitals sued by Plaintiffs have been dismissed from the action on 11th Amendment, state action or Local Government Antitrust Act immunity grounds, only the remaining private hospitals are listed in the caption.

**3.** In a Report and Recommendation filed February 12, 1999 (Docket Item No. 642), the

cussions were conducted between February and August, 1998 under court supervision. On February 23, 1998, Riverside moved for summary judgment. On April 7, 1998, that motion was dismissed by the undersigned as premature and without prejudice. No settlement having been reached, on October 20, 1998, the court vacated the stay on discovery as to class certification issues and issued a scheduling order directing such discovery.

In an order filed February 12, 1999, the undersigned stated the court would permit summary judgment motions "which do not require substantial additional discovery" to be filed. Decision and Order filed February 12, 1999 (Docket Item No. 642), at 7. Thereafter, on April 7, 1999, Riverside filed the instant motion for summary judgment (Docket Item No. 666) ("Riverside's Notice of Motion for Summary Judgment") on three alternative grounds including state action immunity, an asserted education exemption to the Sherman Act, and on the merits of the alleged conspiracy. Riverside's motion was accompanied by a statement of undisputed facts pursuant to Local Rules of Civil Procedure (W.D.N.Y.) 56 ("Riverside's Statement of Facts"), a Memorandum of Law in Support of Defendant Riverside's Motion for Summary Judgment ("Riverside's Memorandum"), and exhibits. Plaintiffs cross-moved on May 28, 1999 for discovery pursuant to Fed.R.Civ.P. 56(f) (Docket Item No. 683), filing a Memorandum of Law in Support of Cross–Motion for Rule 56(f) Relief and in Opposition to Motion for Summary Judgment (Docket Item No. 684) ("Plaintiffs' Response to Riverside's Motion") and a Statement of Facts pursuant to Rule 56 (Docket Item No. 685). On June 16, 1999, Riverside filed a Combined (1) Reply to Plaintiffs' Opposition to Motion for Summary Judgment and (2) Opposition to Plaintiffs' Motion for Rule 56(f) Relief (Docket Item No. 696) ("Riverside's Reply"), and the Declaration of Philip O'Neill (Docket Item No. 698) ("O'Neill Declaration"). Plaintiffs filed, on June 30, 1999, a Memorandum of Law in Further Support of Cross–Motion for Rule 56(f) Relief (Docket Item No. 703) ("Plaintiffs' Reply to Riverside's Motion").

Meanwhile, on June 16, 1999, Defendant OLM moved for summary judgment (Docket Item No. 695) ("OLM's Notice of Motion for Summary Judgment"), asserting essentially the same grounds for relief as Riverside asserts. OLM also filed a Memorandum of Law in Support of Motion for Summary Judgment of Defendant Our Lady of Mercy Medical Center (Docket Item No. 697) ("OLM's Memorandum"). On July 27, 1999, Plaintiffs filed a cross-motion for discovery pursuant to Fed. R.Civ.P. 56(f), accompanied by a statement of facts pursuant to Local Rules of Civil Procedure 56 (Docket Item No. 723), and Plaintiffs' Memorandum of Law in Support of Cross–Motion for Rule 56(f) Relief and in Opposition to Our Lady of Mercy Medical Center's Motion for Summary Judgment (Docket Item No. 724) ("Plaintiffs' Response to OLM's Motion"). On August 13, 1999, OLM filed a Response to Plaintiffs' Local Rule 56 Statement (Docket Item No. 735) and a Reply Memorandum of Law in Support of Motion for Summary Judgment of Defendant Our Lady of Mercy Medical Center and in Opposition to Plaintiffs' Cross–Motion for Rule 56(f) Relief (Docket Item No. 736) ("OLM's Reply"). Plaintiffs, on August 26, 1999, filed a Memorandum of Law in Further Support of Cross–Motion for Rule 56(f) Relief

undersigned recommended that Defendants' motions to certify the jurisdictional issues for interlocutory appeal be granted.

(Docket Item No. 742) ("Plaintiffs' Reply to OLM's Motion"). Oral argument was deemed unnecessary.

Based on the following, Defendant Riverside's motion for summary judgment should be GRANTED based on state action immunity; alternatively, the motion should be DENIED based on an asserted education exemption to the Sherman Act and Plaintiffs' agency theory of conspiracy. OLM's motion for summary judgment should be DENIED on all grounds. Plaintiffs' cross-motion for discovery is DENIED as to Riverside's request for state action immunity and DISMISSED as moot with respect to Riverside's claims of an education exemption and lack of involvement in the alleged conspiracy. Plaintiffs' cross-motion for discovery is DISMISSED as moot with respect to all grounds on which OLM has moved for summary judgment.

### FACTS [4]

The American Board of Medical Specialties ("ABMS"), is an umbrella organization for numerous medical specialty boards. ABMS authorizes its member boards to issue various certificates in their respective fields, conferring on qualifying physicians the status of Diplomate in their medical specialties. Defendant American Board of Emergency Medicine ("ABEM") is one such medical specialty board that administers a certification examination in emergency medicine to physicians who ABEM determines based on its published criteria are eligible to sit for the examination. Upon successful completion of the examinations, these physicians are given the status of Diplomate of ABEM and considered ABEM board certified physicians.

Since ABEM's inception in 1976 and until June 30, 1988, applicants could follow two primary paths to be eligible to sit for ABEM's certification examination. Such eligibility could be established by completing an approved three year residency training program in emergency medicine ("the residency track") or by completing 7,000 hours and 60 months of practice and/or teaching in emergency medicine, provided 2,800 hours were accumulated within 24 consecutive months ("the practice track"). A third and less common eligibility track, the special application track, permitted physicians who could demonstrate training or experience equivalent to the residency or practice tracks to sit for the examination. In accordance with its original charter provisions, ABEM discontinued the "practice track" on June 30, 1988. Prior to discontinuance of the practice track, ABEM had certified 8,000 emergency physicians, 7,000 of whom qualified to sit for the examination pursuant to the practice track. It is undisputed that few physicians have been permitted to sit for the certification examination under the special application track. Accordingly, after 1988 the only way to qualify to sit for the ABEM certification examination is to complete an accredited emergency medicine residency training program offered by one of the hospital Defendants.

The Accreditation Council of Graduate Medicine Education ("ACGME") is the governing body for accreditation of medical education programs, although the actual evaluation of programs is performed by the Residency Review Committee ("RRC") for the particular field of medicine involved. For example, the emergency medicine residency programs are reviewed and

---

4. The fact statement is taken from the pleadings and motion papers filed in connection with the instant motions.

evaluated by the Residency Review Committee for Emergency Medicine ("RRC–EM"). At the time this action was commenced, ABEM was the only emergency medicine specialty board recognized by the ABMS and the American Medical Association ("AMA"). As such, ABEM had substantial impact and influence in the specialty area of emergency medicine and the medical community throughout the United States. ABEM was formed and created by the American College of Emergency Physicians ("ACEP"), a non-defendant alleged co-conspirator, which is a national professional trade association of emergency physicians. ACEP continues to be a sponsor of ABEM.

According to Plaintiffs, ABEM, along with ACEP and AMA determined that they would be the sole sponsors of RRC–EM. Second Amended Complaint, ¶ 46. Through such sponsorship, ABEM exerts substantial impact and influence on the specialty of emergency medicine, including the control and development of emergency medicine residency programs. *Id.* The alleged conspiracy thus involves an agreement among ABEM, CORD, and the hospital Defendants, and includes ABEM's elimination of the practice track, the rejection by various professional organizations of "alternative pathways" to residency programs to attain ABEM certification, RRC–EM's setting of special requirements including ABEM certification for faculty in emergency medicine residency programs, ACEP and ABEM's encouragement of hospitals to hire ABEM certified emergency physicians, and the refusal of each hospital Defendant to hire emergency physicians who are not ABEM certified or eligible.

Plaintiffs maintain that each hospital Defendant is engaged in the administration and operation of at least one postgraduate emergency medicine residency program. Defendants allegedly benefit from the alleged conspiracy by, *inter alia,* creating and sustaining artificially inflated prices for the services of ABEM certified and ABEM eligible physicians. According to Plaintiffs, the resulting artificial lowering of the supply of ABEM certified residency programs reduces competition against the hospital Defendants' emergency medicine residency programs. Such restraints are alleged to also ensure an adequate supply of residents who provide medical labor at costs lower than for full-fledged physicians, generating increased funding for their emergency medicine residency programs, and creating and sustaining artificially inflated Medicare, Medicaid, workers' compensation and insurance reimbursement. As a result, the public allegedly is damaged by artificially inflated costs of emergency medicine, misleading information as to the qualifications of emergency medicine physicians, and a shortage of emergency medicine physicians as those ineligible for ABEM-certification become discouraged by decreased employment opportunities and leave the field.

Plaintiffs also assert that ABEM conspired with other non-Defendant organizations to keep the practice track closed and to prevent development of alternative paths to ABEM certification. For example, Plaintiffs maintain that when another medical specialty board under the umbrella of ABMS, the American Board of Internal Medicine ("ABIM"), notified ABEM of its intention to file for authority to certify ABIM Diplomates as emergency medicine specialists, ABEM negotiated with ABIM and created a special practice track permitting a limited number of ABIM-certified physicians specializing in internal medicine to apply for ABEM certification.

Plaintiffs allege that ABEM and the hospital Defendants, including Riverside

Methodist Hospitals ("Riverside"), and Our Lady of Mercy Medical Center ("OLM"), and various professional organizations in the field of emergency medicine, including Defendant Council of Emergency Medical Residency Directors ("CORD"), conspired to restrain trade by limiting eligibility for ABEM certification to the residency program. Plaintiffs claim the conspiracy was effected through the actions of various ABEM certified physicians who were either employed or affiliated with the hospital Defendants' residency programs in emergency medicine.

Riverside maintains that the state action immunity which the court found shields OSUH from liability in this action extends to Riverside as Riverside is merely a "participating institution" in a emergency medicine residency program sponsored by OSUH. Riverside also asserts that its involvement in OSUH's emergency medicine residency program is limited to education which, it is contended, is not activity subject to antitrust regulation. Alternatively, Riverside argues that Plaintiffs' claims, based on a "program representative" conspiracy theory, are insufficient as a matter of law as no evidence shows that Riverside ever authorized Dr. Douglas A. Rund, a professor of medicine at OSUH who was formerly Director of the OSUH-sponsored resident teaching program in emergency medicine and the person alleged by Plaintiffs to have acted on behalf of Riverside, to act as Riverside's representative with respect to any association alleged by Plaintiffs to be a co-conspirator.

Similarly, OLM maintains that as Lincoln has been found immune from liability on the pending claims under state action immunity, OLM is immune as it also is involved in this action only based on its participation in a residency training program in emergency medicine sponsored by NYMC. OLM also asserts that its purport-ed link to the alleged conspiracy, Dr. Marc A. Borenstein who was the director of OLM's residency program when the ABEM practice track was closed, is not OLM's agent and that the challenged conduct, *i.e.*, OLM's participation in an emergency medicine residency program, is noncommercial activity and, thus, not subject to the Sherman Act. Alternatively, OLM requests that should the court decide Plaintiffs are entitled to discovery on the merits before ruling on its summary judgment motion, such discovery should be limited to that necessary to determine the claims against OLM.

## DISCUSSION

### 1. *Summary Judgment*

Summary judgment of a claim or defense will be granted when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The moving party for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra,* at 331, 106 S.Ct. 2548.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra,* at 247–48, 106 S.Ct. 2505.

According to the Supreme Court, "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corporation v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998).

Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). In opposing a motion for summary judgment a party "may not simply rely on conclusory statements or on contentions that the affidavits supporting

the motion are not credible." *Goenaga, supra,* at 18 (citing cases). However, Fed. R.Civ.P. 56(f) "allows a party faced with a motion for summary judgment to request additional discovery, and the Supreme Court has suggested that such a request be granted when 'the nonmoving party has not had an opportunity to make full discovery.'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 523 (2d Cir.1996) (quoting *Celotex, supra,* at 326, 106 S.Ct. 2548).

Specifically, Rule 56(f) states

Should it appear from the affidavits of the party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

Although Rule 56(f) is intended to enable a plaintiff to obtain evidence necessary to mount an opposition to summary judgment, it does not permit a plaintiff to engage in a "fishing expedition." *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.,* 725 F.Supp. 669, 680 (N.D.N.Y.1989) (citing *Waldron v. Cities Service Co.,* 361 F.2d 671, 673 (2d Cir.1966), *aff'd sub nom. First National Bank of Arizona, v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569, *reh'g denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968)). A party seeking a continuance to conduct discovery to oppose a motion for summary judgment is required to file an affidavit under Rule 56(f) "explaining (1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in

those efforts." *Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 891 F.2d 414, 422 (2d Cir.1989) (citing *Burlington Coat Factory Warehouse v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985)).

Although parties seeking discovery to defend summary judgment need not present evidence that would be admissible at trial, they must submit factual allegations amounting to more than bare allegations. *Carney v. United States Department of Justice,* 19 F.3d 807, 813 (2d Cir.1994); *See Eastway Construction Corporation v. City of New York,* 762 F.2d 243, 251 (2d Cir.1985) ("A bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment."); *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981) ("a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover."). Thus, "Rule 56(f) cannot be relied upon to defeat a summary judgment motion 'where the result of a continuance to obtain further information would be wholly speculative.' " *Contemporary Mission, Inc., supra,* at 107 (quoting 6 J. MOORE, FEDERAL PRACTICE, ¶ 56.24 at 56–1438) ("An 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, specious, irrelevant, gossamer inference, conjectural, speculative, nor merely suspicious.' "). In the context of a conspiracy claim, "[w]here a plaintiff fails to produce any *specific* facts whatsoever," it is within the district court's discretion to refuse to permit discovery and grant summary judgment. *Contemporary Mission, supra,* at 107 (emphasis added). Further, "[a] court can

reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994).

■ Although Plaintiffs allege causes of action under both Sections 1 and 2 of the Sherman Antitrust Act, the hospital Defendants, including Riverside and OLM are alleged to have violated only § 1 which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal ...." 15 U.S.C. § 1. A violation of § 1 is demonstrated by establishing a combination or some form of concerted action between at least two legally distinct economic entities which constitutes an unreasonable restraint on interstate trade or commerce. *Standard Oil of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Estate Construction Co. v. Miller & Smith Holding Co., Inc.,* 14 F.3d 213, 220 (4th Cir.1994); *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.,* 996 F.2d 537, 542 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). Accordingly, summary judgment is asserted by Riverside and OLM only with regard to Plaintiffs' § 1 claim.

**2. State Action Immunity**

Defendants Riverside and OLM both maintain that their involvement in the emergency medicine residency programs described by Plaintiffs is limited to acting as "participating institutions" in emergency residency programs sponsored by other organizations which have been dismissed from this action based on state action immunity and, as such, Riverside and OLM

are likewise immune from liability as the challenged conduct constitutes state action. Riverside's Memorandum at 1–2; OLM's Memorandum at 2. In particular, Riverside maintains that it does not have an emergency medicine residency program of its own. Riverside's Statement of Facts, ¶ 19. Instead, Riverside's involvement in the allegedly anticompetitive conduct is based on its participation in the emergency medicine residency program sponsored by OSUH, an Ohio state operated hospital and medical teaching facility which was dismissed from this action based on state action immunity. According to Riverside, its participation in OSUH's program arises only from the fact that Riverside permits "OSUH residents to 'rotate' through Riverside's facilities for additional training as an educational courtesy to OSUH." Riverside's Memorandum at 1–2. OLM similarly asserts that its allegedly anticompetitive conduct is limited to its participation in the emergency residency program sponsored by New York Medical College whose primary site for its residency program is Lincoln Medical and Mental Health Center ("Lincoln"), which was dismissed as a Defendant based on state action immunity. OLM's Memorandum at 2–3. Although neither Riverside nor OLM moved to dismiss based on state action immunity when the earlier jurisdictional motions were filed, neither has either party waived its right to assert that such immunity applies.

■ The state action immunity doctrine provides that conduct on behalf of the state which is no more than simply intrastate regulation is beyond the reach of the Sherman Act. *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 103, 100 S.Ct. 937, 63

L.Ed.2d 233 (1980). The doctrine derives from the nation's federal system. *Id.* Specifically, "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker, supra,* the Supreme Court held that as the Sherman Act is directed against individual rather than state action, state regulatory programs could not be held to violate it. *Parker, supra,* at 352, 63 S.Ct. 307.

As stated, this court has dismissed OSUH and Lincoln as Defendants in this action based on the alternative grounds of state action and 11th Amendment immunity.[5] Provided Riverside and OLM demonstrate that the actions challenged in this case were taken by them as private parties acting at the direction of state officials or agencies, albeit voluntarily as an accommodation to such state authorities, they may be entitled to the same "state action" antitrust immunity that applies to those officials or agencies. *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 56–57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985).

The Supreme Court has explained that

If *Parker* immunity were limited to the actions of public officials, this assumed congressional purpose would be frustrated for a State would be unable to implement programs that restrain competition among private parties. A plaintiff could frustrate any such program merely by filing suit against the regulated private

---

5. In the event the District Judge should find the decision accepting the Report and Recommendation to have rested solely upon OSUH's 11th Amendment immunity, the court reit-

erates and relies upon the state action immunity found as an alternative ground for OSUH's dismissal.

parties rather than the state officials who implement the plan. *Southern Motor Carriers Rate Conference, Inc., supra.*

■ Whether a private party's conduct qualifies for immunity under the state action doctrine is determined according to a two-pronged test. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised by the State itself.'" *Midcal Aluminum, Inc., supra,* at 105, 100 S.Ct. 937 (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)). A private party may claim state action immunity only if both prongs are met. *Southern Motor Carriers Rate Conference, Inc., supra,* at 62, 105 S.Ct. 1721.

■ With regard to the first prong, although the challenged conduct must be pursuant to a "clearly articulated" state policy, there is no requirement that the anticompetitive conduct be compelled by the state to qualify for state action immunity. *Southern Motor Carriers Rate Conference, Inc., supra,* at 61, 105 S.Ct. 1721. Nor need a private party "point to a specific, detailed legislative authorization" permitting the challenged conduct. *Id.* at 64, 105 S.Ct. 1721 (quoting *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 415, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)). Rather, so long as evidence clearly demonstrates the state intended "to displace competition in a particular field with a regulatory structure," the absence of legislative compulsion will not negate a claim of state action immunity. *Southern Motor Carriers Rate Conference, supra,* at 62, 105 S.Ct. 1721. Otherwise, it would be difficult for states to implement anticompetitive policies through regulatory agencies. *Id.* at 64, 105 S.Ct. 1721. Notably, in *Southern Motor Carriers Rate Confer-*ence, *supra,* the Supreme Court held that collective ratemaking activity by motor carriers in four states was conduct taken pursuant to clearly articulated state policy where the legislatures of three of those states had expressly permitted such activity and, although the fourth state had not, the state regulatory structure clearly anticipated such conduct. *Id.* at 65, 105 S.Ct. 1721.

The second prong requires that the challenged conduct be supervised by the state. Absent state supervision, "there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Patrick v. Burget,* 486 U.S. 94, 101, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988) (active supervision requirement not met where state exercised no control or authority to review particular anticompetitive acts of private parties and, thus, to disapprove those that fail to accord with state policy). In *Midcal Aluminum, Inc., supra,* the court held that the second prong was not met with regard to alleged anticompetitive conduct by private parties who set wine pricing schedules pursuant to California wine price-fixing statutes. Although the state authorized private parties to set prices and enforced such price schedules, it did not establish prices, review them for reasonableness, regulate them in terms of fair trade contracts, monitor market conditions nor engage in any "pointed reexamination" of the program. *Midcal Aluminum, Inc., supra,* at 105–106, 100 S.Ct. 937. The court stated that under such circumstances, "[t]he national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement . . . [as] . . . a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declar-

ing that their action is lawful." *Midcal, supra*, at 106, 100 S.Ct. 937 (internal quotation omitted).

As state action immunity has generally been treated by courts, including the Supreme Court, as an affirmative defense, the party asserting it bears the burden of its proof. *Federal Trade Commission v. Ticor Title Insurance Company*, 504 U.S. 621, 625, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992) (state action immunity was "[o]ne of the principal defenses" asserted); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38–39, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) ("municipalities must demonstrate" that their actions were taken pursuant to state policy to obtain immunity); *Patrick, supra*, at 94, 108 S.Ct. 1658 ("respondents have not shown … the active supervision required to result in state action immunity"); *Yeager's Fuel Inc. v. Pennsylvania Power & Light Company*, 22 F.3d 1260, 1266 (3d Cir.1994) (considering state action immunity an affirmative defense in reviewing decision granting summary judgment).

In this case, to obtain state action immunity, Riverside and OLM must present sufficient evidence demonstrating the lack of any material issue of genuine fact disputing that their participation in the OSUH and NYMC emergency medicine residency training programs constitutes action pursuant to clearly articulated state policy actively supervised by state officials. As stated, this court has already determined that OSUH and Lincoln are shielded from antitrust liability for the alleged unlawful conduct under the state action immunity doctrine. Report and Recommendation filed January 16, 1996 (Docket Item No.) at 102–07; *Daniel v. American*

*Board of Emergency Medicine*, 988 F.Supp. 127, 184–186 (W.D.N.Y.1997). Although affidavits and copies of affiliation agreements between Riverside and OSUH establish Riverside is entitled to summary judgment based on state action immunity, that determination cannot be made based on the submissions with regard to OLM as its papers establish the existence of a genuine issue of material fact regarding whether state action immunity applies.

### 1. *Riverside Methodist Hospitals*

█ As stated, Riverside maintains that it does not sponsor a residency program of its own in emergency medicine, although it participates in an emergency medicine residency program sponsored by OSUH which was dismissed from this action based on state action immunity. Riverside now asserts that as its participation is limited to permitting OSUH emergency medicine residents to "rotate" through Riverside's facilities to gain exposure to a wider variety of patient cases, Riverside is also entitled to state action immunity.[6]

In its January 16, 1996 Report and Recommendation, the undersigned found that OSUH was entitled to state action immunity as the "Ohio state legislature has vested in the Ohio State University substantial powers to supervise, regulate and control the University Hospital and its staff." January 16, 1996 Report and Recommendation at 105; 988 F.Supp. at 185. As the Ohio legislature granted the Ohio State University ("OSU") trustees the authority to create and maintain a college of medicine, the legislature contemplated the hiring of physicians for the medical school. *Id.* at 106. OSUH's bylaws require that

---

**6.** Although not specifically defined, the term "rotate" as used in Riverside's papers implies that those physicians who are chosen for OSUH's emergency medicine residency program are assigned to and utilize Riverside's

facilities for a portion of their residency terms, *i.e.*, that they observe or participate in the diagnosis and treatment of patients admitted to Riverside's emergency treatment facility.

although the appointment of its staff members is based on recommendations made by its clinical departments, medical directors and credentialing committee, final decisions are made by the OSU trustees. January 16, 1996 Report and Recommendation at 106 n. 58 (citing OSUH Bylaws § 3335–43–04(E)). OSUH's bylaws require that all applicants for medical staff positions be board certified in a medical specialty. *Id.* at 106 (citing OSUH Bylaws § 3335–43–04(A)(4)). Upon this evidence, the court found that "any anticompetitive consequences resulting from [OSUH's] exercise of its power to determine what qualifications would be required for placement on the medical staff of [OSUH] were a reasonably foreseeable consequence of the legislature's delegation of authority to the Ohio State University Trustees." *Id.* at 107 (citing *Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.*, 790 F.2d 1032, 1043 (2d Cir.1986)). Accordingly, OSU's anticompetitive conduct was held to be taken pursuant to a clearly articulated state policy and OSUH was dismissed from this action based on state action immunity. *Id.* at 107.

In support of summary judgment, Riverside submitted affidavits from Riverside's President and Chief Executive Officer Nancy Schlichtling, Director of Medical Education Dr. James Lewis, and Program Coordinator for Emergency Medicine Dr. Marian Schuda. *See* Affidavits of Nancy Schlichtling ("Schlictling Affidavit"), Dr. James Lewis ("Lewis Affidavit"), and Dr. Marian Schuda ("Schuda Affidavit"), attached as Exhibits A, B and D respectively, to Riverside's Notice of Motion for Summary Judgment. These affidavits establish that Riverside does not operate its own emergency medicine residency program but, rather, merely provides OSUH with use of its facilities to enable OSUH's emergency medicine residents to gain greater experience in that field than would

otherwise be available at OSUH's facilities alone.

The affidavits establish that Riverside, a not-for-profit hospital incorporated under the laws of Ohio, operates general and specialty acute care medical and surgical facilities in Columbus, Franklinville County, Ohio and surrounding counties. Schlichtling Affidavit, ¶ 3. Although Riverside does not operate a medical school, it sponsors postgraduate residency programs in several fields of medical specialty, but does not sponsor a residency program in emergency medicine. Dr. Lewis Affidavit, ¶ 3. Since 1980, Riverside's emergency medicine department has been staffed by Samuel J. Kiehl, M.D., d/b/a Olentangy Emergency Physicians ("OEP"), an independent medical group. Schlichtling Affidavit, ¶ 9. Riverside does not pay for patient care rendered by any of the physicians who are employed by OEP as those physicians are hired, supervised, compensated and promoted by OEP. *Id.*

OSUH is a state operated hospital and medical teaching facility located in Columbus, Ohio, which sponsors the only accredited emergency medicine residency program in the central Ohio area. Dr. Lewis Affidavit, ¶ 4. Pursuant to an affiliation agreement with OSUH, and as an "educational courtesy" to OSUH, Riverside allows OSUH's emergency medicine residents to rotate through Riverside's emergency room facilities to gain exposure to a greater number and broader variety of patient cases than would be encountered training at OSUH facilities alone. Schlichtling Affidavit, ¶ 10, Lewis Affidavit, ¶ 4, Schuda Affidavit, ¶ 4. Dr. Lewis is responsible for supervising and directing the teaching and general education activities of Riverside. Lewis Affidavit, ¶ 3.

As Riverside and OSUH are separate and distinct institutions, however, Riverside does not control, administer or participate in OSUH's emergency medicine resident program other than teaching and supervising OSUH's emergency medicine programs' residents while they are assigned to Riverside. Lewis Affidavit, ¶¶ 4–5. Nor does Riverside solicit, recruit or advertise for post-graduate residents in emergency medicine. Lewis Affidavit, ¶ 3. Riverside receives no compensation from OSUH in exchange for its use of Riverside's facilities, and does not compensate OSUH's program officials, nor participate in or possess any control over the solicitation, recruitment or selection of persons into OSUH's emergency medicine residency program or the selection of those OSUH residents who utilize Riverside's facilities in connection with their residencies. *Id.*, ¶¶ 5–6.

Dr. Schuda is responsible for daily, non-clinical administration of Riverside's "component" of that program, *i.e.*, the teaching of OSUH residents who rotate through Riverside's emergency medicine department upon arriving at Riverside. Schuda Affidavit, ¶ 4; Lewis Affidavit, ¶ 4. Overall supervision of OSUH's emergency medicine residency program is performed exclusively by its sponsor, OSUH, through a program director ("the Program Director") appointed by OSUH from among the OSUH emergency medicine faculty. Lewis Affidavit, ¶ 6. The current Program Director is Richard Nelson, M.D., while Douglas A. Rund, M.D., was OSUH's Program Director when the ABEM practice track was closed. *Id.* Although Dr. Nelson and Dr. Rund have both been accorded courtesy privileges on Riverside's affiliated teaching staff to facilitate their educational duties, members of that staff possess no voting rights and thus are without power or ability to influence Riverside's medical staff policy or rules. *Id.*, ¶ 6.

A copy of the Affiliation Agreement between Riverside and OSUH submitted by Riverside in support of summary judgment is consistent with the Schlichtling, Lewis and Schuda Affidavits, and establishes that Riverside does not sponsor or operate an emergency medicine residency program of its own and that OSUH's program in which it participates is actively supervised by the state. Affiliation Agreement for Integrated Post M.D. Graduate Medical Education Between Ohio State University and Riverside Hospitals, Exhibit E to Riverside's Notice of Motion ("Riverside–OSUH Affiliation Agreement"). In particular, the Riverside–OSUH Affiliation Agreement provides that the Program Director, an OSUH employee, is responsible for seeing that the educational objectives set by the American Council on Graduate Medical Education ("ACGME") are met by the program in all OSUH's participating institutions. Riverside–OSUH Affiliation Agreement, ¶ 2.3.a. Toward that end, OSUH's Program Director is "responsible for the general administration of the program, including recruitment, selection, instruction, supervision, counseling, evaluation, advancement of residents and the maintenance of records relating to program accreditation." *Id.*, ¶ 2.3.b. OSUH's Program Director, in consultation with Riverside's Emergency Medicine Program Coordinator, selects and appoints the teaching faculty at Riverside who must meet OSUH's faculty criteria. *Id.*, ¶¶ 2.3.c., 2.4.b. The Program Director also approves the appointment of the chief of teaching services at Riverside, *id.*, ¶ 2.3.d., appoints all OSUH residents, *id.*, ¶ 2.3.e, and determines the rotations and assignments of each resident and member of Riverside's teaching faculty. *Id.*, ¶ 2.3.f. OSUH pays the emergency medicine residents' salaries and benefits although Riverside reimburses OSUH for the full cost

of each full time equivalent resident while assigned to Riverside. *Id.*, ¶ 2.2.a.

The court finds these affidavits and the Affiliation Agreement establish that Riverside neither sponsors nor operates an emergency medicine residency program of its own and that its participation in OSUH's emergency medicine residency program meets both prongs of the *Midcal* test for application of state action immunity, thus shielding Riverside from liability for the challenged anticompetitive conduct. Specifically, with regard to the first element, Riverside's involvement in an emergency medicine residency program was limited to its cooperative participation in OSUH's program which this court has determined to be pursuant to clearly articulated state policy. January 16, 1996 Report and Recommendation at 107; 988 F.Supp. at 186. Any administrative or supervisory actions or policies by Riverside with regard to the residents who use Riverside's facilities are dictated by OSUH. Significantly, Riverside receives no compensation from OSUH in exchange for Riverside's educational resources, does not participate in and has no control over the solicitation, recruitment or selection of persons into OSUH's emergency medicine residency program or the selection of those OSUH residents who will rotate through Riverside's facilities. Insofar as members of Riverside's teaching faculty are required to be ABEM certified, such certification is required by the Affiliation Agreement which requires that members of Riverside's teaching staff apply for and meet OSUH's faculty requirements. Riverside–OSUH Affiliation Agreement, ¶ 2.3.c. Although Riverside provides the facilities where OSUH's emergency medicine residency program is conducted, Riverside's day-to-day administration of that program is limited to supervision and education of the OSUH interns while they acquire professional experience in emergency treatment of patients at Riverside. Riverside's role in OSUH's emergency medicine residency program is thus properly characterized as an extension of OSUH. Accordingly, Riverside's participation in the OSUH emergency medicine residency program was pursuant to a clearly articulated state policy.

With regard to the second element, the Program Director, an OSUH employee, was responsible for administering and supervising Riverside's participation in OSUH's emergency medicine residency program. *Id.*, ¶ 2.3.b. The program director is appointed by the Chair of the Ohio State University College of Medicine, *id.*, ¶ 2.3, of which OSUH is a unit. January 16, 1996 Report and Recommendation at 105–106; 988 F.Supp. at 185. Accordingly, the Program Director's supervision of Riverside's actions with regard to the emergency medicine residency program constituted active supervision by the state.

Riverside has therefore sustained its burden of demonstrating that it is entitled to summary judgment based on its affirmative defense of state action immunity and the court considers whether Plaintiffs have demonstrated the existence of a genuine issue of material fact sufficient to defeat summary judgment.

■ To defeat summary judgment, Plaintiffs must present evidence sufficient to establish a genuine issue of material fact disputing that Riverside is entitled to state action immunity. As stated, Plaintiffs have cross-moved pursuant to Fed. R.Civ.P. 56(f) to conduct discovery on the merits of this actions to enable Plaintiffs fairly to oppose both summary judgment motions. In particular, Plaintiffs argue that granting Riverside's motion for summary judgment would constitute an abuse of judicial discretion given that discovery on the merits of this case has been stayed

since April 29, 1994, and that, in fact, to date there has been no such discovery in this action. Plaintiffs' Response to Riverside's Motion at 3, 7–11. The requested discovery, however, need not be granted here as the information requested, if existent, cannot establish a genuine issue of material fact contradicting Riverside's assertion that it does not sponsor or operate an emergency medicine residency program of its own but, rather, participates in OSUH's emergency medicine residency program.

Plaintiffs seek discovery relevant to Riverside's state action immunity defense including information pertaining to Riverside's involvement in the administration and operation of OSUH's emergency medicine residency program in which Riverside participates. Affidavit of Mary C. Fitzgerald, Esq., in Support of Cross–Motion for FRCP 56(f) Relief and in Opposition to Riverside's Motion for Summary Judgment, filed May 28, 1999 (Docket Item No. 683) ("Fitzgerald Affidavit—Riverside"), ¶ 19. Plaintiffs' Rule 56(f) affidavit essentially recapitulates the allegations of the Second Amended Complaint, asserting that the requested discovery will enable them to establish that Riverside's decision making structure will reveal that Riverside participated in and administered and controlled the residency programs and its officials, or, alternatively, acquiesced in and adopted decisions and actions by persons not within Riverside's control. Fitzgerald Affidavit—Riverside, ¶ 22. In particular, Plaintiffs assert that if such discovery were granted they would obtain facts demonstrating that the state of Ohio did not impose requirements on Riverside regarding Riverside's participation in the overall conspiracy or even with respect to the narrow issue of hiring ABEM-certified physicians. Similarly, Plaintiffs believe the facts they seek to obtain will show that the state of Ohio did not require or compel Riverside to participate in an emergency medicine residency program, that the state did not supervise, oversee or have ultimate decision-making power over Riverside's participation in the program, and that the state is not prohibiting or preventing Riverside from terminating its participation in the program.

Fitzgerald Affidavit—Riverside, ¶ 20.

Plaintiffs also assert that

the discovery sought should demonstrate the decision-making structure of the hospital and the extent to which medical personnel in the emergency department and residency program had input into and made decisions on behalf of the hospital and the residency program. Similarly, discovery is expected to demonstrate the extent to which Riverside participated in, administered and controlled the residency program and its officials. *Alternatively*, it *may* demonstrate that Riverside acquiesced in and adopted the decisions and actions taken by persons who were not strictly controlled by Riverside.

Fitzgerald Affidavit—Riverside, ¶ 22 (emphasis added).

Plaintiffs also state they

believe that merits discovery will reveal the closure of the practice track affected the development of Riverside's residency program by increasing and ensuring a high demand for that program. The discovery sought should also demonstrate that the shortage of ABEM-certified physicians ensured federal funding and grants (or perhaps greater funding and grants) for Riverside's program.

Fitzgerald Affidavit—Riverside, ¶ 23.

This information, even if existent, cannot create a genuine issue of material fact to deny summary judgment based on state action immunity, particularly as Plaintiffs

have conceded that Riverside does not sponsor its own emergency medicine residency program but, instead, participates in OSUH's program. Specifically, Plaintiffs assert that "Riverside participates in an emergency medicine program." Plaintiffs' Statement Pursuant to Local Rule 56 at 3, n. 10. In response to Riverside's Statement of Facts Pursuant to Local Rule 56, ¶ 8, Plaintiffs state they do not dispute the facts contained in ¶ 8

> insofar as they allege that Riverside participated in the same emergency medicine residency program which OSUH sponsored and that at least one Affiliation Agreement regarding that residency program exists. . . .

Plaintiffs' Statement Pursuant to Local Rule 56 filed May 28, 1999 (Docket Item No. 685), at 9, ¶ 8 (emphasis added).

These postulations support Riverside's sworn statements that it merely participated in OSUH's emergency medicine residency program and is thus entitled to state action immunity.

Further, Plaintiffs' repeated references to "the" residency program is significant when considered with the fact that Plaintiffs do not dispute Riverside's contention that it does not have its own residency program. *See, e.g.,* Riverside's Response at 30 ("the residency program in which Riverside participates"). Even if discovery were granted and the facts posited by Plaintiffs established, such evidence would not tend to negate the ultimate fact that Riverside's involvement in the OSUH was exempt under the state action doctrine. Liberally interpreted, Plaintiffs are asserting only that Riverside voluntarily elected to collaborate with OSUH and that OSUH did not closely supervise Riverside in the administration of the residency program. However, private conduct need not be compelled in order to invoke the state action immunity doctrine. *Southern Mo-*

*tor Carrier Rate Conference, supra,* at 61. Moreover, even the absence of day-to-day state supervision of the private conduct would not prevent application of the doctrine. *Midcal, supra,* at 106, 100 S.Ct. 937. Plaintiffs' alternative theory, that the potential evidence could conceivably show Riverside "acquiesced" in OSUH's direction only reinforces a finding of state action.

Nor do the documents produced by Riverside in response to jurisdictional discovery which Plaintiffs maintain confirm Riverside's active involvement in the residency program, Fitzgerald Affidavit—Riverside, ¶ 40 (citing documents attached thereto as Exhibit C), support Plaintiffs' request. While those documents indicate that Riverside was permitted to recommend changes to the OSUH emergency medicine residency program based on observations of the OSUH residents' work and professional behavior, they do not indicate that a Riverside official has any authority to implement such recommendations. Accordingly, the discovery requested in Plaintiffs' Rule 56(f) affidavit, even if existent, would not negate Riverside's state action immunity defense.

Plaintiffs argue that it is an abuse of judicial discretion to grant summary judgment without first permitting them an opportunity to conduct discovery on the merits, particularly in a complicated antitrust matter such as the instant case. Plaintiffs' Response to Riverside's Motion at 7–11; Plaintiffs' Reply to Riverside's Motion at 1–2. However, there is ample case law in this circuit that supports granting summary judgment without first permitting the non-movant the opportunity to conduct discovery especially where, as here, it is evident from the circumstances of the case that the requested discovery cannot possibly defeat summary judgment. *See Carney, supra,* at 813 (holding district court's

denial of cross-motion for discovery pursuant to Rule 56(f) and simultaneous grant of summary judgment was proper where defendant, who had conducted over 100 interviews and significant academic research was unable to identify any interviewed individual or published source on which he purportedly relied in support of assertions in Rule 56(f) affidavit); *Eastway Construction Corp., supra,* at 251 (upholding district court's grant of summary judgment dismissing antitrust action brought under § 1 of the Sherman Act and denial of plaintiffs' motion for discovery pursuant to Rule 56(f) where affidavit submitted in support of discovery alleged no specific facts from which an inference that defendants engaged in concerted action, a necessary element of the case, could be drawn); *Contemporary Mission, supra,* at 107 (affirming district court's grant of defendants' summary judgment motion dismissing alleged conspiracy and simultaneous denial of plaintiffs' Rule 56(f) motion for discovery where affidavits submitted in support of discovery were devoid of any "specific facts" supporting the alleged conspiracy whereas the defendants' affidavits in support of summary judgment amply refuted allegations). As discussed, in this case, Riverside's submissions in support of summary judgment persuasively demonstrate its involvement in the challenged activity was limited to its participation in OSUH's emergency medicine residency program and Plaintiffs' requested discovery, if existent, cannot establish otherwise. *See* Discussion, *supra,* at 209–211.

Nor is there any merit to Plaintiffs' contentions that discovery may reveal that Riverside directly participated in the conspiracy through actions separate from its participation in OSUH's emergency medicine residency program, including that each of the hospital Defendants was directly involved in co-conspiratorial acts such as the independent adoption of credentialing policies requiring ABEM certification or eligibility for hiring, promotions, renumeration, appointment and salary increases. Plaintiffs' Response to Riverside's Motion at 22–23 (citing July 16, 1996 Report and Recommendation (Docket Item No. 537 at 23–24) (citing Second Amended Complaint, ¶¶ 34, 82, 104, 106–110)); *see also Daniel v. American Board of Emergency Medicine,* 988 F.Supp. 112, 124–25 (W.D.N.Y. 1997) (same). Plaintiffs have not, however, disputed that Riverside's emergency medicine department has been staffed by OEP since 1980, nor that it is OEP which hires, supervises, compensates and promotes those physicians. *See* Schlichtling Affidavit, ¶ 9. Notably, OEP is not named as a party to this lawsuit, nor referred to as a non-defendant co-conspirator. Further, any physician in Riverside's emergency medicine department who is a member of the emergency medicine residency program teaching staff is required to meet OSU's criteria for faculty appointments. Riverside–OSUH Affiliation Agreement, ¶ 2.3.c. That such criteria includes ABEM certification or eligibility cannot be the basis for antitrust litigation as OSUH has been found immune from liability based on state action immunity.

Plaintiffs' alternative contention that Riverside and OLM may nevertheless be found to have joined the conspiracy directly rather than on a representative basis and that Rule 56(f) discovery directed to this theory of liability should therefore be allowed is without merit. As framed, the Second Amended Complaint presumes the sponsorship of or participation in an accredited emergency medicine residency program as providing both the foundation upon which a hospital Defendant is alleged to have joined the alleged conspiracy and the required motive to engage in the alleged restraint of trade. Second Amended Complaint, ¶¶ 4, 14, 34, 35, 88–90. Evi-

dence of an antitrust motive is a prerequisite to a Sherman Act § 1 claim. *Daniel, supra,* at 235 (citing *Bhan v. NME Hospitals, Inc.,* 669 F.Supp. 998, 1015 (E.D.Cal. 1987) (citing *Wilson Indus., Inc. v. Chronicle Broadcasting Co.,* 794 F.2d 1359, 1365 (9th Cir.1986), and VI P. Areeda, Antitrust Law ¶¶ 1412a, 1425b (1986))). Accordingly, if a hospital Defendant is alleged to have sponsored or participated in an emergency medicine program and such program is immune from antitrust liability, whether the hospital Defendant joined the conspiracy directly or indirectly is irrelevant to Plaintiffs' claim, and Rule 56(f) discovery on either theory should be denied. If such participation or sponsorship were not essential to Plaintiffs' claim, any hospital in the United States which offers emergency room services could be a member of the alleged conspiracy, a proposition not advanced by Plaintiffs.

Riverside also maintains it "has not refused training or employment to any of the 176 physician-plaintiffs identified in Schedule A to the Second Amended Complaint." Riverside's Statement of Facts, ¶ 18. Although Plaintiffs dispute this assertion, Plaintiffs' Response to Riverside's Statement of Facts, ¶ 18, nothing supporting that opposition has been submitted by Plaintiffs, although such information reasonably would be available to Plaintiffs without discovery.

Plaintiffs also argue that to grant summary judgment without permitting them to conduct discovery on the merits would be inconsistent with this court's previous determinations that such motions were premature. Plaintiffs' Response to Riverside's Motion at 22–23 (citing July 16 Report and Recommendation (Docket Item No. 537) at 7–8 n. 4, and April 7, 1998

Order (Docket Item No. 618)). However, as stated, Plaintiffs have conceded Riverside does not sponsor or operate an emergency medicine residency program of its own and the question of OSUH's immunity has been fully litigated. Whether Riverside enjoys similar immunity based on the state action doctrine which attaches to OSUH represents an extension of the court's prior findings. Granting summary judgment at this time where Plaintiffs have failed to demonstrate any basis for their cross-motion for discovery is, therefore, not inconsistent with this court's prior decisions.

Accordingly, Defendant Riverside's motion for summary judgment should be GRANTED and Defendant Riverside thereby dismissed as a Defendant, and Plaintiffs' cross-motion for discovery is DENIED.

### 2. *Our Lady of Mercy Medical Center*

■ OLM asserts it is entitled to state action immunity as its challenged conduct was limited to participation in the emergency medicine residency program "sponsored" by NYMC for which Lincoln, which has been found entitled to state action immunity (January 16, 1996 Report and Recommendation at 105, 988 F.Supp. at 185), is the primary clinical training site. Pursuant to authority granted by the New York State legislature, Lincoln is operated by the New York Health and Hospital Corporation ("the HHC"), a public benefit corporation, to provide and maintain medical services, research, education and training programs for the residents of New York State. N.Y. Unconsol. L. §§ 7382, 7385(8), (11) (McKinney 1979 & 1995 Supp.).[7] The court found the New York legislature acted pursuant to clearly ex-

---

7. Unless otherwise indicated, references to McKinney's New York Unconsolidated Laws

are to the 1979 edition and 1999 Supplement.

pressed policies to promote "hiring a highly qualified and trained medical staff to provide services for the residents of New York City," the achievement of which required well-trained and board certified physicians and was, therefore, reasonably foreseeable, regardless of whether such resulted in anticompetitive conduct. January 16, 1996 Report and Recommendation at 104–105. In determining that Lincoln was entitled to state action immunity, the court found that Lincoln, while itself not a state agency, is a political subdivision of New York State which the state has authorized to perform the challenged action by clearly articulating a state policy authorizing the allegedly anticompetitive conduct. January 16, 1996 Report and Recommendation at 104 –105; 988 F.Supp. at 184–85. Lincoln was, therefore, dismissed from this action based on state action immunity. January 16, 1996 Report and Recommendation at 105; 988 F.Supp. at 185.

In support of summary judgment, OLM submitted affidavits from Senior Vice President of Academic Affairs Dr. Ralph J. Lauriello, and Director of Emergency Medicine Harold H. Osborn, NYMC's Emergency Medicine Residency Program Director Dr. Marc Borenstein, and Clinical Chairman of OLM's Department of Emergency Medicine Dr. Timothy G. Haydock, See affidavits of Dr. Ralph J. Lauriello ("Lauriello Affidavit"), Dr. Harold H. Osborn ("Osborn Affidavit"), Dr. Marc Borenstein ("Borenstein Affidavit"), and Dr. Timothy G. Haydock ("Haydock Affidavit"), attached as Exhibits A, B, C and D, respectively, to OLM's Notice of Motion for Summary Judgment. However, these affidavits, rather than demonstrating OLM is entitled to summary judgment on the basis of state action immunity, reveal the existence of a genuine issue of material fact precluding summary judgment.

According to the affidavits, OLM is a not-for-profit medical center located in the Bronx, New York, which has never operated a medical school nor sponsored an emergency medicine residency program. Lauriello Affidavit, ¶ 3. Instead, OLM participated in an accredited post-graduate residency program in emergency medicine sponsored by New York Medical College ("NYMC"), a private not-for-profit medical school located in Valhalla, New York, which does not treat patients and, thus, arranged for clinical training of its medical students at nearby hospitals including OLM and Lincoln.[8] Lauriello Affidavit, ¶ 4; Borenstein Affidavit, ¶ 3. Lincoln was the primary training site for such residents. Lauriello Affidavit, ¶ 7. By affiliating with OLM which generally serves an older patient population, Lincoln was able to gain clinical experience for NYMC's emergency medicine residents in geriatric care, in contrast to the trauma and substance abuse issues to which the residents were typically exposed at Lincoln. Lauriello Affidavit, ¶ 6; Osborn Affidavit, ¶ 5; Borenstein Affidavit, ¶ 7.

In connection with its participation in the NYMC emergency medicine residency program, OLM permitted emergency medicine residents, graduates of NYMC, to rotate through OLM's emergency department. Lauriello Affidavit, ¶ 4; Osborn Affidavit, ¶ 4. OLM also agreed to provide for a certain number of residency "lines," i.e., budget lines allocating funds for salary and fringe benefits for residents, however, OLM had no authority with regard to the administration of the residency program, including hiring residents, interviewing candidates, or developing the curriculum; rather, OLM's role was limited to serving as an additional clinical training site for NYMC's residency program. Osborn Affi-

8. NYMC has not been named as a defendant in this action.

davit, ¶ 9. All emergency medicine education conferences and lectures were conducted at Lincoln rather than at OLM which was "simply a 'campus' through which the residents rotated." Borenstein Affidavit, ¶ 8.

OLM initially served only as a rotation site for NYMC's emergency medicine residents; the program later became "integrated" with OLM having some input in its administration.[9] Lauriello Affidavit, ¶ 8. All final decisions regarding the emergency medicine residency program were made by either NYMC or Lincoln. Lauriello Affidavit, ¶ 8. NYMC's Program Director ("the Program Director"), who is responsible for the overall supervision of NYMC's emergency medicine residency program is appointed by and maintains an office at Lincoln, but was an employee of NYMC. Lauriello Affidavit, ¶¶ 9–10; Borenstein Affidavit, ¶¶ 1, 6, 11; Haydock Affidavit, ¶ 4. The Program Director was responsible for the residency program's curriculum, interviewing and accepting applicants into the residency program, setting residents' schedules, hiring qualified faculty, developing the program's curriculum and ensuring the residents received proper training. Osborn Affidavit, ¶¶ 7, 8; Borenstein Affidavit, ¶ 9. Although OLM was permitted some "input" with respect to the administration of the residency program and its curriculum and hiring, OLM lacked any decision-making authority on such issues (Haydock Affidavit, ¶ 7; Borenstein Affidavit, ¶ 10) as "OLM was simply a clinical training site." Borenstein Affidavit, ¶ 10. As Program Director of NYMC's emergency medicine residency program between 1988 and 1990, Dr. Borenstein was not an officer, director or employee of OLM, never held any administrative position with or sought practice privileges at

OLM, nor was he involved with the governance of OLM's medical staff. Lauriello Affidavit, ¶ 9–10, 15.

The relationship between OLM and NYMC is governed by a general affiliation agreement pursuant to which emergency medicine graduates, accepted into NYMC's residency program, gain exposure to a larger and more diverse variety of patient cases as a result of performing residency services in OLM's emergency facilities than would otherwise be available within the NYMC–Lincoln program. Lauriello Affidavit, ¶ 6; Osborn Affidavit ¶ 5; Haydock Affidavit, ¶¶ 1, 3. A separate affiliation agreement governed the relationship between OLM and Lincoln. Lauriello Affidavit, ¶ 7; Haydock Affidavit, ¶ 4.

Upon a fair reading of these affidavits, the court is unable to determine whether the emergency medicine residency program in which OLM participates is more properly characterized as NYMC's or Lincoln's program. The distinction is crucial to determining whether OLM's participation in such residency program qualifies as conduct pursuant to clearly articulated state policy. That the Program Director, charged with overall supervision of the residency program, is an employee of NYMC although appointed by Lincoln further hinders an accurate appraisal of the relationships among the three organizations.

The affiliation agreements between OLM and NYMC ("the OLM–NYMC Affiliation Agreement"), as well as between OLM and Lincoln ("the OLM–Lincoln Affiliation Agreement"), while consistent with these affidavits, do not clarify whether OLM's participation in NYMC's residency program qualifies as state action to support application of the doctrine.[10] Ac-

---

**9.** OLM has not defined the term "integrated."

**10.** Copies of the OLM–NYMC Affiliation Agreement and the OLM–Lincoln Affiliation

cording to the OLM–NYMC Affiliation Agreement, OLM and NYMC agreed "to cooperate in the establishment of medical student rotations at [OLM] and integrated and affiliated residency programs between [OLM] and other [NYMC]-affiliated institutions." OLM–NYMC Affiliation Agreement, ¶ 3.a.

Lincoln, another NYMC-affiliated institution, was NYMC's primary residency program site and administered the emergency medicine residency training program. Discussion, *supra*, at 214–15. OLM was responsible for the salaries and benefits of NYMC's emergency medicine residents while they rotated through OLM's facilities. OLM–Lincoln Affiliation Agreement. The emergency medicine residents were required to attend patient rounds and departmental conferences planned by OLM's residency site director and educational coordinator in conjunction with the emergency medicine residency training Program Director to ensure that the material offered at OLM's emergency department conferences was similar to that offered at Lincoln and that the residents did not miss any of Lincoln's core curriculum while they were assigned to OLM's facilities. *Id.*, ¶ 4.00(III). The emergency medicine residents who train at OLM are also required to be released from residency service obligations to attend departmental meetings and mandatory conferences at the Lincoln site. *Id.* Rather than pointing to a residency program sponsored and directed by Lincoln, these factors create ambiguity as to the relevant issue.

OLM's submissions in support of summary judgment demonstrate the existence of a genuine issue of material facts as to whether OLM's participation in the residency program, sponsored by NYMC, constitutes state action or that Lincoln's role

in the program demonstrates Lincoln is the agency which operates it. This point is critical as although this court previously found that the HHC was authorized "to operate Lincoln in the interest of providing and maintaining medical services, research, education, and training programs for the residents of New York state," January 16, 1996 Report and Recommendation, at 102 and 988 F.Supp. at 184 (citing N.Y. Unconsol. Laws §§ 7382, 7385(8), (11)), no similar finding was found with regard to NYMC and its relationship to OLM. Further, although the New York legislature clearly expressed concern regarding the provision and delivery of comprehensive case and treatment of the ill and infirm within the State of New York and New York City, N.Y. Unconsol. Laws § 7382, and the legislature, toward that end, specifically authorized the HHC "to *sponsor* and *conduct* research, educational and training programs," N.Y. Unconsol. Law § 7385(8)(emphasis added), and to employ the personnel necessary to achieve that goal, N.Y. Unconsol. Laws § 7385(11), it is not clear that OLM's participation in the residency program sponsored by NYMC constitutes state action or that Lincoln's role in the program is sufficient to show it, and not NYMC, conducts the program as its own.

With regard to the second element for application of state action immunity requiring active state supervision for state action immunity to apply to a private party, NYMC's emergency medicine residency program director, Dr. Borenstein, although appointed by Lincoln, is an employee of NYMC. This fact raises a question as to whether Dr. Borenstein's supervision of the NYMC's emergency medicine residency program qualifies as active *state* supervision.

Agreement are attached as Exhibits E and F, respectively, to OLM's Notice of Motion.

As OLM has failed to demonstrate that the absence of material questions of fact as to whether either prong of the test for applicability to state action immunity to third parties has been met, its motion for summary judgment is DENIED, and Plaintiffs' cross-motion for Rule 56(f) discovery is DISMISSED as moot.

### 3. Non-Commercial Conduct

■ In the event that the District Judge disagrees with the court's recommendation that Defendant Riverside's motion for summary judgment be granted without first permitting Plaintiffs to conduct discovery pursuant to Rule 56(f), and as the court recommends that Defendant OLM be denied summary judgment on the ground of state action immunity, the court addresses whether Riverside or OLM is entitled to summary judgment on the basis that the allegedly anti-competitive conduct with which those Defendants were involved was limited to education which, as non-commercial activity, is therefore not subject to antitrust liability under the Sherman Act, and whether Plaintiffs should be permitted to conduct limited discovery on the issue.

Defendants Riverside and OLM assert that their participation in emergency medicine residency programs was educational in nature, rather than commercial, and as such, cannot serve as a predicate for antitrust liability. Riverside's Memorandum at 15; OLM's Memorandum at 18. Plaintiffs maintain that Riverside and OLM have mischaracterized the Second Amended Complaint's allegations on this point, ignoring that Riverside and OLM allegedly conspired to restrict the supply of ABEM-certified physicians which resulted in increased demand for the emergency medicine residency programs in which those Defendants participate, thereby providing economic benefits to Defendants who were

able to staff their emergency departments with lower cost residents while experiencing increased federal funding and prestige for such programs. Plaintiffs' Response to Riverside's Motion at 41; Plaintiffs' Response to OLM's Motion at 19.

The education exemption to the Sherman Act has not been widely applied and caselaw on the subject is sparse. Neither party has cited and the court's research has not revealed a case on point. In fact, in the one case in which the Second Circuit considered the education exemption, *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59 (2d Cir. 1997), it was found inapplicable.

At issue in *Hamilton Chapter of Alpha Delta Phi*, was whether the allegations by plaintiff fraternities challenging the defendant private college's residential services policy whereby all students were required to live in college housing and to participate in college meal plans constituted trade or commerce such that a monopoly claim under the Sherman Act was stated. *Hamilton Chapter of Alpha Delta Phi, supra*, at 63. In considering the issue, the Second Circuit observed that "Congress intended the antitrust laws to apply to a wide array of commercial conduct so as to foreclose unfair business practices wherever they occur." *Id.* at 63 ("The legislative history of the Sherman Act reveals that it was not intended to reach noncommercial activities that are intended to promote social causes.") (internal citations omitted). Institutions of higher learning "engage in a wide spectrum of conduct, ranging from the distinctly noncommercial to the purely proprietary," and the Sherman Act does not apply to those aspects that are distinctly noncommercial in character, such as determining the content of a school's curriculum. *Id.*, at 65 (citing cases). Moreover, activities that are so central to the educational mission such that they are "re-

moved from the 'business competition' regulated by the Sherman Act" are not "trade or commerce" within the meaning of that act. *Id.* at 64.

For example, the formation and development of an accreditation policy by a non-profit educational corporation that functioned as an accrediting agency for schools in a specific geographic area of the country has been held beyond the ambit of the Sherman Act. *Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc.*, 432 F.2d 650, 654 (D.C.Cir.), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970) (holding accrediting agency did not violate antitrust regulations by requiring non-profit status as a prerequisite to its accreditation). Rather, "an incidental restraint of trade, absent an intent or purpose to affect the commercial aspects of the profession, is not sufficient to warrant application of the antitrust laws." *Id.* (footnote omitted). A medical school's admissions criteria upon which foreign medical students' transfer applications were either accepted or rejected have also been held "non-commercial" in nature. *Selman v. Harvard Medical School*, 494 F.Supp. 603, 621 (S.D.N.Y.) ("The Sherman Act was certainly not intended to provide a forum wherein disgruntled applicants to medical school could challenge their rejections."), *aff'd*, 636 F.2d 1204 (2d Cir.1980) (Table).

In contrast, the Sherman Act does apply to higher education activities that are largely proprietary in nature. *Hamilton Chapter of Alpha Delta Phi, supra*, at 64. A university was held to have violated § 2 of the Sherman Act when its bookstore engaged in predatory pricing. *Sunshine Books, Ltd. v. Temple University*, 697 F.2d 90 (3d Cir.1982). The National Collegiate Athletic Association's college television plan which limited the number of college games for broadcast by its member schools was held to have violated the Sherman Act. *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Further, in *United States v. Brown University*, 5 F.3d 658 (3d Cir.1993), on which both Riverside and OLM rely in support of summary judgment, the court found that a university's disbursement of financial aid to needy students qualified as commercial activity subject to Sherman Act regulation as it affected the price, *i.e.*, tuition, paid for the education offered. *Brown University, supra*, at 666. In *Brown*, the court stated that whether a transaction is classified as commercial or noncommercial "is based on the nature of the conduct in light of the totality of the circumstances." *Brown University, supra*, at 666.

Although Riverside and OLM both maintain that their participation in the respective emergency medicine residency programs was purely educational in nature, Plaintiffs argue that they are not challenging the teaching aspects of either Defendant. Plaintiffs' Response to Riverside's Motion at 41–42; Plaintiffs' Response to OLM's Motion at 20. Rather, Plaintiffs maintain that the predicate acts taken in furtherance of the alleged conspiracy include such activities as efforts to thwart competing alternative residency programs, temporarily reopening the practice track for certain Diplomates of ABIM to avoid the creation of a competing certification board, and misleading the public into believing ABEM certified or eligible physicians are better qualified than Plaintiffs. Plaintiffs' Response to OLM's Motion at 20. According to Plaintiffs, Riverside's and OLM's actions clearly are intended to manipulate the marketplace and price to be paid for the services of ABEM-certified physicians, as well as to reduce the emergency department

staffing costs for the hospital Defendants by guaranteeing a flow of lower priced residents.

As stated, Plaintiffs have moved pursuant to Fed.R.Civ.P. 56(f) for discovery they claim is necessary to properly oppose the summary judgment motions. Whether a commercial motive underlies superficially noncommercial activity sufficient to subject the activity to antitrust analysis often cannot be determined without providing the plaintiff with an opportunity for discovery. *Hamilton Chapter of Alpha Delta Phi, supra*, at 65. Indeed, whether the education exemption may be applied to a residency program in which medical services are dispensed by apprentice-like physicians to patients for a fee cannot be determined without discovery. However, whether Plaintiffs have met their burden in demonstrating the necessity of the requested discovery need not be addressed at this time as the summary judgment motions are premature insofar as they are based on the education exemption.

In particular, discovery as to whether the education exemption applies will necessarily be directed toward the moving Defendants' motivation to participate in the emergency medicine residency programs on which their involvement in the alleged conspiracy is based and will inevitably require more than the limited discovery envisioned by the court when it stated it would consider summary judgment motions "which do not require substantial additional discovery." February 12, 1999 Decision and Order (Docket Item No. 642), at 7. Moreover, the education exemption is potentially a basis on which all Defendants could be dismissed from this action and the court does not wish to invite piecemeal litigation.

The district court has inherent authority to manage its docket. *Xerox Corp. v. 3Com Corp.*, 69 F.Supp.2d 404, 406 (W.D.N.Y.1999). As permitting discovery on the issue of the education exemption is both inconsistent with the court's February 12, 1999 Decision and Order and would likely result in piecemeal litigation, it is DENIED.[11]

Therefore, the summary judgment motions by both Riverside and OLM should be DENIED on this ground and Plaintiffs' motions for Rule 56(f) discovery should be DISMISSED as moot.

### 4. *Agency/Conspiracy Theory*

In the event the District Judge disagrees with the recommendation that Riverside should be dismissed based on state action immunity, as the court is recommending denying summary judgment to OLM based on state action immunity, and that summary judgment be denied to both Riverside and OLM based on the asserted education exemption to the Sherman Act, the court addresses whether either Riverside or OLM is entitled to summary judgment based on Plaintiffs' theory that those Defendants engaged in the alleged anticompetitive conspiracy through the actions of their agents, with the alleged co-conspiring professional organizations, as well as whether Plaintiffs should be permitted to conduct limited discovery on the issue. Plaintiffs maintain that Riverside and OLM participated in the conspiracy with ABEM and the other hospital Defendants to keep the practice track closed through agents acting on behalf of Riverside and OLM. Plaintiffs' Response to Riverside's Motion at 13–15, 31; Plaintiffs' Reply to Riverside's Motion at 7–8; Plaintiffs' Response to OLM's Motion at 7, 10, 11–12; Plaintiffs' Reply to OLM's Motion at 6–9.

---

**11.** By separate order, the court has calendared a Rule 16(b) conference with the parties to consider entry of a case management order permitting full merit-based discovery.

Riverside and OLM seek summary judgment on this issue, arguing that they never authorized any employee or physician to act on their behalf with respect to any decision by ABEM or CORD to close or to keep closed the practice track to board certification in emergency medicine. Riverside's Memorandum at 19–35; OLM's Memorandum at 4–11.

This court has previously found that none of the hospital Defendants can be members or participants in any of the alleged co-conspirator organizations, including ABEM and ACEP, except for CORD, whose membership consists of individual hospital residency programs accredited by the RRC–EM. January 16, 1996 Report and Recommendation at 234; 988 F.Supp. at 235. Additionally, the court rejected Plaintiffs' prior assertions that physicians who were associated with various hospital Defendants held "leadership roles in the organizations which collectively control emergency medicine," such that the hospital Defendants participated in the alleged conspiracy through these physicians who acted as agents with the Defendant professional organizations. *Id.* at 234–35; 988 F.Supp. at 235–36. Although the court noted that it was possible for the hospital Defendants to belong to CORD, it also recognized that those hospital Defendants which do not maintain residency training programs in emergency medicine, including Riverside, do not belong to CORD. January 16, 1996 Report and Recommendation at 229 n. 133 and 235 n. 142; 988 F.Supp. at 233 n. 130, 236 n. 139. As OLM did not earlier move to dismiss based on jurisdictional grounds, it did not previously make any submissions on that point. Nevertheless, with regard to the instant motion, OLM states it has never been a member of CORD, Lauriello Affidavit, ¶ 11, a fact which Plaintiffs do not dispute.

However, contrary to Riverside's and OLM's assertions, it is not the law of this case that the hospital defendants cannot be liable based on an agency theory for conspiring with ABEM or any of the other alleged co-conspirator professional organizations. In addressing this issue in the context of determining whether this court had personal jurisdiction over the hospital Defendants pursuant to N.Y.Civ.Prac.L. R. § 302(a)(2) (McKinney 1990), *i.e.*, based on having transacted business in New York, the court stated that "as the members of the AMA, ABEM, ACEP, AACEM, RRC–EM, and other emergency medicine professional organizations are the individual physicians, regardless of any relationships those physicians have with the hospital Defendants, such relationships are inadequate to render these Defendants subject to antitrust liability for the professional organizations' alleged wrongful acts, as such acts cannot be imputed to the physician members *on the basis of their mere membership* in an organization or on one of its committees." January 16, 1996 Report and Recommendation at 237–38 (emphasis added); 998 F.Supp. at 236–37 (same). The court did not address whether any Defendant could be liable for acts of its employees based on conduct going beyond "mere membership" in the alleged co-conspiring professional organizations.

Riverside argues that Plaintiffs' failure to identify anyone other than Dr. Rund as associated with both Riverside and the alleged co-conspiring professional organizations and who could thus possibly act as their agent warrants summary judgment as Dr. Rund's actions are shielded from antitrust liability under state action immunity. Riverside's Memorandum at 20–22; 25–31. However, Plaintiffs' discovery on this issue was limited to that necessary to establish whether the court had personal jurisdiction over Riverside. It was, therefore, not necessary to consider whether

other employees of Riverside could have acted either as its agent, or directly, in promoting the alleged restraint of trade attributed to ABEM and the other organizations.

OLM argues that Plaintiffs' failure to identify anyone other than Dr. Borenstein as acting as agent between OLM and the alleged co-conspiring professional organizations warrants summary judgment as Dr. Borenstein did not serve as Program Director until after the decision to close the practice track was made and, further, that the decision to close the practice track had been made before OLM agreed to participate in NYMC's emergency medicine residency program. Osborn Affidavit, ¶ 4; Borenstein Affidavit, ¶ 15; *See also* OLM's Statement of Facts, ¶¶ 10, 17. However, these assertions, if true, do not negate Plaintiffs' allegations of conspiracy to maintain closure of the practice track and to prevent alternative tracks from being developed. Second Amended Complaint, ¶¶ 8, 11–12. Further, as OLM did not move for summary judgment on jurisdictional grounds, Plaintiffs have had no opportunity for any discovery on the allegations regarding OLM.

Whether Defendants Riverside and OLM may yet be found liable based on indirect involvement in the alleged conspiracy, however, cannot be determined without permitting full merit-based discovery which has been stayed pending resolution of the class action certification motion. The summary judgment motions, on this ground, are thus premature.

Plaintiffs further maintain that Riverside's and OLM's contention ignores the allegations that the hospital Defendants directly conspired with each other to keep the practice track closed. In support of their motions, Plaintiffs point to the July 16, 1996 Report and Recommendation where the court found that the Second Amended Complaint stated a claim for conspiracy under § 1 of the Sherman Act by alleging that

each of the hospital Defendants was directly involved in the co-conspiratorial acts, including the independent adoption of discriminatory and exclusionary credentialing policies which require ABEM certification or eligibility, denial of positions, promotions, renumeration, appointments and salary increases as the result of Plaintiffs' lack of ABEM certification or eligibility, and the hospitals have allegedly forced Plaintiffs to accept demotions, decreased responsibilities, decreased salaries and undesirable work shifts as the result of lack of ABEM certification or eligibility.

Plaintiffs' Response to Riverside's Motion at 22–23 (citing July 16, 1996 Report and Recommendation (Docket Item No. 537 at 23–24)); *See also* 988 F.Supp. at 124–25.

However, although the court held those allegations sufficient to demonstrate a cause of action under Sherman Act § 1 to survive a motion to dismiss for failure to state a claim, July 16, 1996 Report and Recommendation (Docket Item No. 537 at 24; 988 F.Supp. at 125), as pleaded in the Second Amended Complaint, such claims depend on the hospital Defendants' participation in or sponsorship of an accredited emergency medicine residency program to establish the requisite motive for those Defendants to join the alleged conspiracy. Discussion, *supra*, at 213. Accordingly, regardless of whether Riverside or OLM is successful in avoiding liability based on agency theories, neither may be liable for their direct involvement in the alleged conspiracy if it is ultimately determined that they participated in or sponsored an emergency medicine residency program that is immune from liability based on the state action doctrine. Otherwise, it is possible that either Riverside or OLM may be

found to have joined the alleged conspiracy based on participation in or sponsorship of an emergency medicine residency program to which state action immunity does not apply. However, in the absence of discovery on the merits, summary judgment as to the means, either direct or indirect, by which Riverside and OLM joined the conspiracy is premature.

Accordingly, Riverside's and OLM's summary judgment motions should, on this ground, be DENIED and Plaintiffs' cross-motions for Rule 56(f) discovery are DISMISSED as moot.

## CONCLUSION

Based on the following, Defendant Riverside's motion for summary judgment (Docket Item No. 666) should be GRANTED based on state action immunity; alternatively, the motion should be DENIED based on an asserted education exemption to the Sherman Act and Plaintiffs' agency theory of conspiracy. OLM's motion for summary judgment (Docket Item No. 695) should be DENIED on all grounds. Plaintiffs' cross-motion for discovery as to Riverside's summary judgment motion (Docket Item No. 683) is DENIED as to the request for state action immunity and DISMISSED as moot with respect to Riverside's claims of an education exemption and lack of involvement in the alleged conspiracy. Plaintiffs' cross-motion for discovery as to OLM's summary judgment motion (Docket Item No. 722) is DISMISSED as moot with respect to all grounds for which OLM has moved for summary judgment.

As to Plaintiffs' requests for discovery it is

SO ORDERED.

January 20, 2000.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

SO ORDERED.